Laboni A. Hoq (SBN 224140)
HOQ LAW
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004
Email: laboni@hoqlaw.com

Wilmer Harris (SBN 150407)
SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
Phone: (626)441-4129
Fax: (626) 283-5770
Email: wharris@sshhzlaw.com

V. James DeSimone (SBN 119668)
V. JAMES DESIMONE LAW
13160 Mindanao Way #280
Marina Del Ray, California 90292
Telephone: (310) 693-5561
Email: vjdesimone@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAHREN JAMES and VICTORIA PATTERSON, <br><br> *Plaintiffs*, <br><br> v. <br><br> CITY OF SOUTH PASADENA, MATTHEW RONNIE, in his individual capacity, RANDY WISE, in his individual capacity, SPENCER LOUIE, in his individual capacity, RICHARD BARTL, in his individual capacity, CHRIS PEREZ, in his individual capacity, RICHARD CHENEY, and Does 1 through 10, <br><br> *Defendants*. | Case No. 2:21-CV-08256 <br><br> **COMPLAINT** |

# INTRODUCTION

1.     In the aftermath of George Floyd's callous murder by Minneapolis police, communities across the country rose up to protest police brutality against African Americans. Plaintiffs Fahren James, an African American woman, and Victoria Patterson, an ally, were among them. In the summer of 2020, they began what would become a four-month long series of peaceful protests in the City of South Pasadena ("City"). With a diverse group of local supporters, they displayed hand-made signs in support of racial justice and the Black Lives Matter ("BLM") movement in the City's business district several days each week. While they anticipated some would oppose their message, they were soon shocked to learn that the local police would be complicit in hate crimes against them and allow the perpetrators to act with impunity.

2.     Ms. James' brother, also active in the protests, made early overtures to the South Pasadena Police Department ("SPPD") to make clear they would not allow anti-police signs and rhetoric at the protests, and to ensure SPPD would lend police protective services if need be. He was well-aware that racial justice protesters like them were increasingly the target of violent counter-protesters, but assumed the police, located just blocks from the protest, would protect them.

3.     Unfortunately, that assumption proved incorrect. Throughout the summer and fall of 2020, White supremacist vigilantes repeatedly attacked Ms. James, Ms. Patterson and their fellow BLM protesters as they exercised their First Amendment rights. They also used threats, intimidation and coercion to do so.

4.     In one attack, Joe Richcreek spat on Ms. James and Ms. Patterson, and hurled racial epithets at them. Because SPPD failed to follow mandatory duties to protect them, Richcreek returned twice to attack them, once hitting Ms. James with a fist-sized rock and another time spewing threats with a lead pipe under his arm.

5.     In another attack, Defendant Richard Cheney, a supporter of the Proud Boys, intentionally drove his truck over a sidewalk and almost hit Ms. James to stop

her from putting up a protest sign. The incident was captured on the nearby Starbucks surveillance video. When Ms. James reported the assault to SPPD, Watch Commander, Defendant Ronnie, ordered SPPD officers not to arrest Cheney, or even issue him a traffic citation. Instead, they let him go and issued a biased press release, attempting to justify his actions, and chill their future protest activity.

6.     In the face of such hate crimes, SPPD officers failed to carry out their mandatory duties to protect Ms. James, Ms. Patterson and their fellow protesters from further harm. Instead, acting on their bias against Ms. James on account of her race, and her fellow protesters on account of their affiliation with BLM, they sought to chill their activities by blaming them for the attacks on account of their "cop hating." Just before the Cheney incident, SPPD also threatened to take down Ms. James' protest signs improperly claiming they violated a City ordinance. In doing so, SPPD not only violated her civil rights, but its public antipathy to her activities placed protesters at greater risk of repeat attacks by White supremacist vigilantes.

7.     SPPD's discrimination and retaliation against Ms. James came from the top. Then Chief of Police Joe Ortiz, Sergeant and Watch Commander, Defendant Matthew Ronnie, Sergeant, Defendant Richard Bartl, Sergeant, Defendant Spencer Louie, and Corporal, Defendant Randy Wise, all engaged in, as well as directed and ratified the discrimination against Ms. James. The actions of these high-ranking officers reflected a culture of anti-BLM sentiment, and support for White supremacist groups throughout the force, such that it became its policy and practice.

8.     Through this lawsuit, Ms. James and Ms. Patterson seek redress against Defendant City of South Pasadena for the actions of SPPD officers who violated their civil rights, and Defendant Cheney for assaulting Ms. James and infringing on her right to peacefully protest for racial justice. Ms. James and Ms. Patterson also seeks to enjoin SPPD and Cheney from engaging in similar conduct in the future, so they and their fellow racial justice protesters can feel secure in exercising their civil rights going forward.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this matter involves federal questions under the First and Fourteenth Amendments to the U.S. Constitution, 42. U.S.C 1983, and because Ms. James and Ms. Patterson seek injunctive relief to protect her First Amendment rights.

10.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2). On January 6, 2021, Ms. James and Ms. Patterson timely filed administrative tort claims with the City South Pasadena. The City issued notices rejecting certain of their claims on April 21, 2021, and April 22, 2021. Mr. James and Ms. Patterson have exhausted all available administrative remedies. Cal. Gov't. Code §§ 913, 945.6(a)(1).

**PARTIES**

11.     Plaintiff Fahren James is a resident of Los Angeles County, California. Ms. James was over eighteen years old at the time Defendants violated her civil rights as described in this Complaint.

12.     Plaintiff Victoria Patterson is a resident of South Pasadena in Los Angeles County, California. Ms. Patterson was over eighteen years old at the time Defendants violated her civil rights as described in this Complaint.

13.     Defendants Matthew Ronnie,  Robert Bartl, Spencer Louie, Randy Wise and Chris Perez are officers of the South Pasadena Police Department. At all relevant times, they were acting under color of law within the course and scope of their duties as South Pasadena Police Department officers, and as agents and employees of the City of South Pasadena.

14.     Defendant City of South Pasadena ("City") is a political subdivision organized under the laws of California and a proper defendant in this action as to Ms. James' claims made pursuant to the California Tort Claims Act, Cal. Gov't Code §§ 810-996. The City was at all relevant times the employer of Defendants

Ronnie, Bartl, Perez and Wise. It is liable for the tortious actions and omissions of its employees.

15.    The South Pasadena Police Department is a department of the City. On information and belief, the City, through the South Pasadena Police Department, maintains an unlawful policy, practice or custom of depriving African Americans and BLM protestors, including Ms. James and Ms. Patterson, of their rights to (1) free speech and association, including peaceful protests in support of racial justice, in violation of the First amendment of the U.S. Constitution, (2) due process liberty interests, including their right to personal security, in violation of the 14th amendment to the U.S. Constitution, and (3) equal protection, under the 14th amendment to the U.S. Constitution, by engaging in acts and omissions intended to chill their free speech and association rights; failing to treat reported assaults against them as potential hate crimes, taking steps to protect victims, and creating false, inaccurate and biased police reports of those assaults, in violation of their mandatory duties; and acting in complicity with their attackers to allow them to violate Ms. James, Ms. Patterson and others' rights with impunity. This unlawful policy, practice, or custom is reinforced by the South Pasadena Police Department's supervision and, on information and belief, its training.

16.    Defendant Richard Cheney is a resident of South Pasadena, California. Defendant Cheney was over the eighteen years old at the time he is alleged to have violated Ms. James' civil rights as described in this Complaint.

17.    The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10, inclusive, and each of them, are unknown to Ms. James and Ms. Patterson, who therefore sue said Defendants by such fictitious names. Ms. James and Ms. Patterson are informed and believe, and upon such information and belief allege, that each of the Defendants fictitiously named herein as a Doe is legally responsible, negligently, recklessly or intentionally, or in some actionable manner, for the events and happenings

1  referenced herein, and proximately caused the injuries and damages to Ms. James

2  and Ms. Patterson alleged herein. Ms. James and Ms. Patterson will seek leave of

3  Court to amend this Complaint to assert the true names and/or capacities of such

4  fictitiously named Defendants when the same have been ascertained.

5       18.   Ms. James and Ms. Patterson are informed and believe and thereon

6  allege, that at all times mentioned herein, Defendants, and each of them, including

7  Does 1 through 10 are individually and/or jointly liable in some manner for the

8  wrongs alleged herein, and/or were the agents, servants, and/or co-conspirators of

9  their Co-Defendants, and/or aided and abetted their Co-Defendants, and were, as

10  such, acting in concert, and that each and every Defendant, as aforesaid, when

11  acting as an individual and in concert, perpetrated the negligent, reckless and

12  intentional acts alleged herein and is responsible for the events and happenings set

13  forth herein and proximately caused injury to Ms. James and Ms. Patterson as

14  alleged herein.

15                    **FACTUAL ALLEGATIONS**

16  **July To November 2020: Fahren James and Victoria Patterson's Participation**

17        **in Demonstrations Against Police Brutality in South Pasadena**

18       19.   Plaintiff Fahren James is a social justice activist. She is African

19  American, and the founder of Black Lives Matter South Pasadena ("BLM South

20  Pasadena"). During the summer and fall of 2020, Ms. James led and sustained a

21  four-month-long series of peaceful demonstrations against police brutality in South

22  Pasadena, sparked by the callous killing of George Floyd by a Minneapolis police

23  officer.

24       20.   The protests were initiated by Ms. James' brother, London Lang, who

25  had relatively recently graduated from South Pasadena High School.  Soon Ms.

26  James joined his effort and began to lead and become the public face of them.  Their

27  demonstrations took place three to four times a week for several hours in the early

28  evenings, attracted large numbers of community members, of all ages and walks of

life, from both South Pasadena and surrounding communities who support the BLM movement, and their calls for greater racial justice and police accountability.

21.    Plaintiff Victoria Patterson joined the racial justice demonstrations in June 2020 and participated in them for at least an hour on most days they took place.  She is a novelist, who has lived in South Pasadena with her family for close to thirty years.  She was moved to take part in them both to support the Black Lives Matter movement, as well as to channel the spirit of her deceased friend, whose nephew had been killed by a police officer.

22.    Ms. James' prominent role in the protests made her vulnerable to harm from individuals who did not agree with her message, and harbored hate toward African Americans and their demands for justice for their communities. This was consistent with what other BLM protesters around the country were being confronted by, as documented in numerous media reports of violence against BLM supporters by members of White supremacist, extremist groups who directly and publicly opposed BLM and its messaging.

23.    In anticipation of these obvious and well-publicized realities, at the time he commenced the protests Mr. Lang met with the local police department, SPPD, and explicitly made clear that the protests would be peaceful. He also wanted to make clear that he did not condone anti-police messaging at the protests and would ask people who brought such messages to leave.  Mr. Lang's father is a retired police officer, making him sensitive to anti-police messaging.

24.    In return for these overtures to SPPD, Ms. James assumed she and her fellow protesters would have its support and protection, consistent with its obligation to serve and protect community members equally and without bias. At least in the early days of the protests, SPPD was tolerant of the pro BLM demonstrations, and a few officers even joined them. However, as the protests continued, SPPD became less and less supportive of Ms. James' First amendment rights, and soon began to infringe on them.

25.     Beginning in July 2020, Ms. James and her fellow BLM protesters were assaulted by White supremacist vigilantes in a series of attacks.  When Ms. James called on SPPD to report the incidents, and protect her going forward, it responded with indifference at best, and more often blamed Ms. James' free speech activities for causing the attacks. In at least one instance, SPPD acted in complicity with one of her attackers – Defendant Cheney – to ratify the assault.  The sum total of SPPD's actions left Ms. James and her fellow protesters vulnerable to greater risk of harm, including repeat attacks.

**July-August 2020: Four Attacks Against Ms. James and BLM South Pasadena Protesters by White Supremacist Vigilantes; SPPD's Biased Responses**

26.     The first of the attacks against Ms. James was committed by Joe Richcreek, an individual with a long criminal history, who assaulted Ms. James and Ms. Patterson on multiple occasions.

27.     On July 8, 2020, Richcreek approached the BLM protest site armed with weapons, including a sharpened drumstick, ready for a confrontation.  Richcreek immediately began to question Ms. James about the protest signs, calling them "racist," and calling Ms. James and Ms. Patterson "biased against the white man." Ms. James tried to de-escalate the situation, but Richcreek would not be deterred.

28.     Ms. Patterson was also at the protest site that afternoon, and after watching the altercation from a distance, came closer and began to video record the incident on her phone for Ms. James' protection. Mr. Richcreek then grabbed Ms. Patterson's phone, and after she took it back and proceeded to record the incident, Mr. Richcreek forcefully spat on both Ms. Patterson and Ms. James, which was captured clearly on video. After an additional heated exchange, Mr. Richcreek fled the scene on his bicycle.

29.     In response to a call for assistance from a bystander at the scene, SPPD arrived 25 minutes later – an unreasonably long time given that the SPPD's headquarter is no more than 500 feet from where the assault took place.

30.   Two SPPD officers, Officer Roppo and Corporal Carrillo, listened to what had transpired and watched Ms. Patterson's video of the incident.  However, they failed to take a police report.  When they were about to leave the scene, when Ms. James asked for a police report number, they returned to take a formal report. However, they failed to carry out their mandatory obligations to comply with the heightened investigatory procedures required when responding to a potential hate crime. Among those obligations were to "preserve evidence that establishes a possible hate crime" (i.e. taking a sample of the spit on the victims Ms. James and Ms. Patterson as a means to apprehend the suspect), SPPD Policy Manual at § 319.4 (c), "take appropriate action to mitigate further injury or damage to potential victims or the community," (*i.e.* running Richcreek's likeness and DNA from his spit through police databases, where he was likely to be identified given his long criminal history), *id*. at § 319.4.2 (d), prominently mark the report as a hate crime, *id*. at § 319.4 (g), and "take reasonable steps to ensure that any such situation does not escalate further," *id*. at § 319.4.2 (i) (*i.e.* proactively following up with Ms. James and Ms. Patterson soon after the attack to inquire about their safety).

31.   On information and belief, Officer Roppo and Carrillo did nothing to try to apprehend Richcreek, and also failed to inform their supervisor Sergeant Valencia of the potential hate crime "as soon as practical." *Id*. at 319.4 (b).  In any event, no SPPD supervisor complied with their mandatory obligation under the circumstances, to "consider directing resources to protect vulnerable sites (such as assigning an officer to specific locations that could become targets)." *Id*. at § 319.4.3.

32.   SPPD's ultimate report of July 8, 2020 incident was materially inaccurate in many respects. Among other things, the report failed to identify Ms. James, an African American woman, as a victim of the incident.  Though Ms. James and Ms. Patterson tried to correct the record by providing SPPD with written corrections, on information and belief, SPPD never forwarded those written corrections to the Alhambra District Attorneys' office, who as a result failed to

1    charge Richcreek with assaulting Ms. James or treat the assault as a hate crime.

2        33.    On July 10, 2020, because SPPD did nothing to try to apprehend

3    Richcreek, he returned to the protest site.  When he spotted Ms. James, he called her

4    a "fucking bitch," and threw a large, fist-sized rock at her which hit her leg. Ms.

5    James and two witnesses to the assault both pursued Richcreek by car and foot, and

6    also called SPPD to seek their assistance in apprehending him. After Ms. James

7    cornered Richcreek, SPPD arrived.

8        34.    The officer in charge, Defendant Wise, did not interview witnesses,

9    including the victim Ms. James, despite their presenting him with statements and

10   video evidence of Richcreek's assaults against Ms. James both earlier that day, as

11   well as two days prior during the spitting incident.  Instead, Defendant Wise

12   immediately became agitated by Ms. James and the other BLM supporters who had

13   gathered to support her, claiming they were a threat to his safety and that of the

14   suspect Richcreek.  He also made explicit his predisposition against them,

15   expressing words to the effect of, "you guys caused this….this is wrong …. the cop

16   hating around here … why bring this to our city."

17       35.    On the other hand, Defendant Wise went beyond the call of duty to

18   protect and advocate for Richcreek, who made clear to Defendant Wise his

19   solidarity with the police, claiming he was acting out against Ms. James, "for you

20   guys," or words to that effect. Defendant Wise did not arrest Richcreek, or even put

21   him in handcuffs or pat him down, despite witness testimony that Richcreek was

22   "not sitting quietly," and video evidence that he had a large rock in his pocket, like

23   the one he earlier used to strike Ms. James.  Despite refusing to arrest him,

24   Defendant Wise advised Richcreek to stay silent so as not to incriminate himself.

25       36.    Not only did SPPD refuse to arrest Richcreek, but it also told Ms. James

26   she would need to make a citizens' arrest if she wanted him held to account.  Ms.

27   James first pushed back, protesting that it was SPPD's job, not hers, to arrest a man

28   for who they had both video and eye-witness evidence had committed two physical

assaults in two days.  Because she had suffered two sleepless nights since Richcreek's prior assault against her, she had no choice but to acquiesce signing the citizen's arrest forms. When SPPD finally took Richcreek into custody, Defendant Wise informed Richcreek, "I'm not arresting you man, SHE is," emphatically referring to Ms. James, essentially placing a target on her back.

37.   Defendant Wise's response to the July 10, 2020 incident was recorded on video by bystanders.  His police report is riddled with false statements. It describes Ms. James and BLM supporters negatively as part of an "angry" and "unruly" group, despite the fact that the video shows nobody was being uncooperative.  Instead, the video depicts Corporal Wise condescendingly lecturing to Ms. James' brother Mr. Lang, who came to support her.  Defendant Wise also falsely blames fear for his safety and that of the suspect Richcreek on account of the protesters for his failure to do absolutely anything to investigate these crimes or question any witnesses.  Defendant Wise's report falsely states, "I was unable to interview James or any of her group about this allegation due to their uncooperative behavior at the scene."  The report also leaves out the fact that Defendant Wise found a large rock in Richcreek's pocket (which is captured on video).

38.   One eyewitness at the scene, South Pasadena Public Safety Commissioner Alan Ehrlich, who also watched the video and reviewed the police report, wrote to the Chief of Police and other City officials about the incident a few days later to express his concern with SPPD's handling of the incident. He stated that he was "disturbed by a number of comments made by Cpl Wise at the time of the arrest, actions taken (and not taken) by officers present, and representations made in the written report."  Regarding the police report prepared by Defendant Wise, Mr. Ehrlich commented, "[t]he term 'BLM protesters' appears throughout the [police] report in what some might consider pejorative." He questioned the truthfulness of the report based on his eye-witness account, calling out as dubious Defendant Wise's claim that he "checked [Ms. James'] leg for any injury caused by

a rock being thrown and did not observe anything." He also observed that "none of the officers came to speak to the victim and help explain the process that was happening or help to de-escalate the situation."

39.    After his arrest, Corporal Wise took Richcreek to SPPD headquarters to question him, purportedly for his safety, but released Richcreek the same night, with a notice to appear for a court hearing. As with the police report of the July 8, 2020 incident, Corporal Wise's report of the July 10, 2020 incident failed to identify it as a potential hate crime let alone follow any of the attendant mandatory duties associated with that designation.  Despite the fact that Defendant Wise's supervisor, Sergeant Louie, was at the scene of the incident, he too failed to carry out his mandatory supervisory duties in connection with the incident.

40.    Soon after the July 8 and 10 Richcreek assaults, Ms. James and Ms. Patterson contacted SPPD, both to request a copy of the police reports for those two incidents and to seek further assistance as victims of hate crimes.  SPPD rebuffed both of these requests by Ms. James, ignoring her emails, and falsely claiming in the police report of the July 10 assault that Defendant Wise tried to call her after that assault to follow up with her.  No such phone call occurred by Defendant Wise or any other SPPD officer to address issues of her ongoing safety.

41.    In contrast, when Ms. Patterson, a White woman who was also a victim of the July 8, 2020 Richcreek assault, asked for SPPD assistance, she received multiple phone calls from several high-ranking officers, including Sergeant Abdalla, Sergeant Louie and Detective Palmieri. However, they did nothing to proactively assist her, falsely claiming their hands were tied because spitting was not an actionable offense.  They also falsely claimed SPPD lacked resources to do anything more to protect her, despite their mandatory duties to the contrary.  Ms. Patterson and Ms. James were forced to navigate the process of obtaining a restraining order against Richcreek on their own, which they felt compelled to do.

42.    Overall, Ms. Patterson felt that SPPD was essentially telling her that the

1   only way for her to ensure her safety was to stop protesting with Ms. James.

2   Despite her ongoing fear for her safety, Ms. Patterson was determined not to

3   abandon Ms. James in carrying out her racial justice mission, particularly because it

4   became clear SPPD would not do its job to protect her.

5       43.   On July 19, 2020, emboldened by SPPD's public bias against Ms. James

6   and the BLM protesters, Richcreek returned to the protest site for the third time to

7   verbally assault Ms. James and her fellow BLM supporters, including Ms. Patterson.

8   He approached their protest signs menacingly with what appeared to be a lead pipe

9   under his arm, threatened to "fight" them, and then fled the scene yelling "All Lives

10   Matter," a well-known anti-BLM slogan. In response to this third attack, SPPD

11   officers Sandoval and Calderon came to the scene and talked to witnesses but failed

12   to make any written report of the incident. On information and belief, they also

13   failed to turn on their body cameras to record the witness statements.

14       44.   Although Richcreek was eventually prosecuted for the July 8 spitting

15   incident (but not the subsequent two assaults on July 10 and 19), the District

16   Attorney did not bring any hate crime charges against him, in part because SPPD

17   failed to investigate, preserve evidence, and accurately report the incidents as such.

18       45.   The Richcreek assaults caused Ms. James and Ms. Patterson significant

19   emotional distress and put them on edge every time they returned to protest.

20   However, Ms. James was committed to her racial justice mission, and continued her

21   regular protest activity out of a sense of urgency to deter further police brutality.

22   Ms. Patterson also firmed her resolve to participate in the protests despite her fear

23   for her and Ms. James' safety, as she felt no choice in light of SPPD's clear

24   abdication of their responsibilities to protect them.

25       46.   Ms. James, Ms. Patterson also had the support of the community, who

26   on August 9, 2020, held a forum at the local Garfield Park to bring public awareness

27   of SPPD's mishandling of the Richcreek assaults.  This community support also

28   gave them strength to continue their peaceful demonstrations, though they remained

hyper vigilant to potential future attacks.  Though she tried whenever possible not to be at the protest site alone, Ms. James was always fearful when no one was available to accompany her.

47.    Unfortunately, on August 30, 2020, there was a fourth attack against Ms. James' fellow BLM protester, Zane Crumley.  At that time, two residents assaulted Mr. Crumley for protesting near the public library, knocking him to the ground and breaking one of his teeth.  One of the attackers specifically denigrated Mr. Crumley's support for BLM. Again, SPPD failed to treat the incident as a hate crime, including carrying out their attendant mandatory duties in responding to it.

**September 2020: To Interfere with Ms. James' Free Speech Rights, SPPD Improperly Warns Her that Her Protest Signs Violate a Local Ordinance**

48.    After almost three months of engaging in peaceful protests, on Sept 22, 2020, an SPPD Officer, Defendant Perez, arrived at the protest site where Ms. James had posted her signs. Defendant Perez provided her a partial copy of the City's municipal code governing restrictions on "Signs in the public right of way" (Sec. 31.2-7(a)). He warned her that her signs were in violation of the ordinance, and that she needed to take her signs down, or SPPD would take them down.

49.    On information and belief, Defendant Perez was directed to issue Ms. James this warning by Sergeant Robert Bartl who in turn was directed to do so by other high-ranking SPPD officers including Defendant Ronnie and Chief Ortiz.

50.    On information and belief, SPPD's decision to issue Ms. James a warning about the legality of her protest signs was in response to a citizen complaint about Ms. James' protest signs by a city resident, Defendant Cheney.  Defendant Cheney's antipathy to the content of Ms. James' signs, and to the BLM movement, was disclosed on his and his wife's social media posts.

51.    Ms. James did not understand her signs to be in violation of the signage ordinance, particularly because the ordinance made clear that it did not apply to the extent it conflicted with her civil rights.  Nonetheless, Ms. James conferred with

then member of the City's Public Safety Commission, Alan Ehrlich, who agreed with her position. On September 24, Mr. Ehrlich emailed City officials, including the Chief of Police, City Manager, City Clerk and City Attorney, regarding the matter. He stated, "one of our officers gave Fahren James a copy of a city ordinance prohibiting displaying of posters and such. Political speech is protected speech by the US and CA constitutions, city attorney Highsmith can weigh in with an official opinion, but the posters & signage displayed by Ms. James are entirely permitted and the officer who gave her the code section might be occused [sic] of harassment and violating civil rights. Let's try to avoid that if we can."

52.   No one from SPPD, or the City, ever responded to Mr. Ehrlich's email about Ms. James' signs, or approached Ms. James again about her protest signs, so she continued to post her signs as she had been doing all along.

**October 2020: Defendant Cheney Assault's Ms. James to Stop her From Putting up a Protest Sign; SPPD Refused to Arrest or Cite Cheney**

53.   On the early afternoon of Saturday, October 3, 2020, a White male South Pasadena resident, Defendant Richard Cheney, intentionally drove his commercial Ram 1800 truck across three lanes of opposing traffic and onto a busy sidewalk where Ms. James was in the process of putting up a protest sign. Mr. Cheney's truck came just feet away from Ms. James. Mr. Cheney admitted that he undertook this dangerous maneuver to "get [Ms. James'] attention" in order to get her to stop "putting the sign up." He also warned Ms. James that she was not allowed to put up the sign, and that he would be calling "Chief Ortiz" to take them down, and then proceeded to call SPPD.

54.   Witnesses overheard Defendant Cheney telling SPPD that Ms. James was putting up her sign "again," indicating this was not the first time he spoke to SPPD about this issue. On information and belief, Defendant Cheney complained to SPPD about Ms. James' signs on or before September 22, 2020, when SPPD officer, Defendant Perez, warned Ms. James that she was violating the signage ordinance.

55.   Facebook posts contemporaneous with the October 3 incident show posts from Defendant Cheney's wife Kristen Erickson Cheney responding to notification from Defendant Cheney about the Ms. James' protest signs, disparaging the content of the signs and the protesters.

56.   When SPPD arrived on the scene of Defendant Cheney's assault on October 3, 2020, an SPPD Officer interviewed Defendant Cheney, Ms. James, and several demonstrators who witnessed the incident.  Despite the fact that multiple witnesses reported Defendant Cheney's intentional assault on Ms. James, and his threat to the physical safety of pedestrians, SPPD declined to arrest Defendant Cheney, or even cite him for the traffic violation.  This decision was made by the SPPD Watch Commander, Defendant Ronnie, who was not at the scene, but directed responding Officers not to take any action against Defendant Cheney.

57.   Defendant Cheney's assault resulted in Ms. James taking time away from her protest activity to seek accountability from SPPD.  Later that day, she met with Defendant Ronnie.  In a video-taped interaction, Defendant Ronnie came out of the SPPD headquarters to meet Ms. James, Ms. Patterson and Mr. Lang. Defendant Ronnie was wearing a  mask with a "Thin Blue Line" logo. "Thin Blue Line" is associated with the Blue Lives Matter movement, which is known to be opposed to the BLM movement, and also associated with White supremacy.

58.   In response to Ms. James questions about why SPPD did not arrest or cite Defendant Cheney, Defendant Ronnie falsely claimed that he was not involved in the decision not to do so.  He later recanted and tried to rationalize his decision not to take action against Cheney based on Ms. James' purported violation of the signage ordinance, stating: "You have two separate things that are independent of each other but are connected by the same event." SPPD thus equated a purported technical violation of the municipal code with a potential bias crime and unilaterally decided without basis that the technical violation negated a hate crime. SPPD also put forth this rationale in a press release, insinuating that Cheney's assault was

1   excusable in light of Ms. James' purported violation of the signage ordinance.

2   59.   SPPD's unilateral determination that Ms. James had violated the signage

3   ordinance was in violation of the City's "Sign Placement and Enforcement

4   Protocol" issued on or about September 30, 2020.  That Protocol makes clear that

5   SPPD "will defer incoming reports of illegally placed signs to the Public Works for

6   confirmation and further disposition," and "will report verified and confirmed

7   violators of illegally placed signs to Code Enforcement." The policy gives no

8   authority to SPPD officers to either warn individuals about its perceived violations

9   of the signage ordinance, let alone the authority to take down signs based on its

10   unilateral determination that they violate the ordinance, as Defendant Perez claimed

11   to have the authority to do on September 22, 2020. It also gave SPPD no authority

12   to refuse to arrest someone who commits an admitted assault because he did so to

13   stop a purported violation of the signage ordinance.

14   60.   As with SPPD's report of the July 8 and 10 incidents, its report of the

15   October 3 incident is riddled with inaccuracies and omissions. It admits that SPPD

16   officers turned off their body cameras at key moments in the investigation,

17   including its interview of Defendant Cheney, truncating the record of the events.

18   61.   The report includes social media posts submitted to SPPD by a

19   concerned community member, which were authored by Defendant Cheney and his

20   wife Kristen Erickson Cheney contemporaneously with Defendant Cheney's

21   October 3, 2020 assault of Ms. James, indicating their hatred toward BLM

22   protesters.  Among other things, the Defendant Cheney made a reference to

23   "lov[ing]" the White supremacist extremist group the Proud Boys. He also reposted

24   a message from another extremist group suggesting that protesters be "hos[ed]"

25   down with feces from a septic tank.

26   62.   Despite evidence of Defendant Cheney's bias against Ms. James on

27   account of her race and affiliation with BLM, SPPD did not treat the October 3

28   incident as a hate crime, let alone comply with associated mandatory obligations.

63.    Many months later, the South Pasadena City Manager Sean Joyce stated in a public forum that, "the fact Richard Cheney was not cited, in my view, was not dealt with appropriately." He also conceded that the City failed to intervene in the matter when it should have, when he stated that if he had a chance to address the matter again, "I'm going to involve myself in (it)."

**November 2020: Trump Rally in South Pasadena Resulting in Assaults by Pro Trump Supporters; SPPD Takes No Action Against Perpetrators**

64.    On November 1, 2020, days before the national Presidential election, Trump supporters held a rally in South Pasadena. The rally was organized by local resident and businessman Matt Bryant, who described the event as about "supporting America, supporting police and supporting President Trump."

65.    Despite multiple calls to SPPD to engage in crowd control, SPPD largely stayed away from the rally.  However, local residents reported that some SPPD officers had been seen "driving around, giving hi-5s to the [pro Trump] protesters, tooting their horns, flashing their car lights in support of the Trumpers."

66.    When a Trump supporter in a "MAGA" hat spat on two counter protesters, including a youth, the victims complained to SPPD.  The responding officer, Corporal Carillo, the same officer who failed to initially take a police report of the July 8, 2020 Richcreek assault, again failed to take a police report.  He also minimized the assault, claiming the police "get spit on all the time," and said even if SPPD located the suspect it would not arrest him.

67.    Toward the end of the day, another Trump supporter operating a booth selling pro Trump merchandise assaulted a youth BLM supporter, when she knocked over some of the vendor's "MAGA" hats.  The pro Trump vendor grabbed the girl by her ponytail, and pulled her to the ground, where other Trump supporters surrounded her and kicked her.

68.    When SPPD were called, they arrived on the scene, and took a few statements from some of the witnesses, but shunned others.  Based on their

interactions with the public that day, the City's own investigation sustained complaints against a number of SPPD officers, including Defendant Wise, and Officers Sandoval and Officer Andrew Dubois, for being "rude" or "disrespectful" in the manner in which they interacted with members of the public who were trying to lodge complaints against the Trump supporters.

69. SPPD ultimately took no action against the Trump vendor for the assault. To the contrary, high ranking SPPD officers, including Chief Ortiz and Watch Commander Ronnie, went out of their way to escort the pro Trump vendor to his car, so he could safely leave the scene.

70. When residents later questioned whether the pro Trump merchandise vendor was authorized to put up a booth in the public right of way, the City Manager admitted that the pro Trump merchandise vendor was in violation of the same signage ordinance SPPD attempted to enforce against Ms. James. On information and belief, SPPD never issued a warning to the Trump merchandise vendor, let alone a citation for violating the ordinance.

**Well-Documented Culture of White Supremacist, Anti-BLM Bias at SPPD**

71. Throughout the summer and fall of 2020, as Ms. James' racial justice protests gained traction, SPPD officers of all ranks demonstrated bias against African Americans, the BLM movement and its supporters, including through their visible support of White supremacist and other extremist groups that oppose them.

72. The following are examples of the explicit anti-BLM, White supremacist culture that persisted at SPPD.

(a)   On July 10, 2020, in response to the second Richcreek assault on Ms. James, Corporal Randy Wise described BLM supporters as a "angry" "unruly," a "mob," and "cop hating."

(b)   On or about July 24, 2020, then SPPD Chief Ortiz was asked to remove from SPPD's official Facebook Page posts that are supportive of "Blue Lives Matter" and "Blue Line Matters," which are movements

associated with White supremacy and anti-BLM sentiment.  Chief Ortiz was also asked to require an officer to remove a Blue Lives Matter sticker from his helmet. Though he agreed to do so, two months later Defendant Ronnie was captured on video wearing a "Thin Blue Line" face mask, indicating Chief Ortiz continued to allowing officers to support groups demonstrating bias against BLM.

(c)  On September 24, 2020, Chief Ortiz sent a group email to police and city staff and city commissioners, inviting them to a "prayer meeting" outside City Hall, organized by members of a documented hate group - the American Society for the Defense of Tradition, Family and Property (TFP).  TFP has taken public positions that are homophobic, sexist and racist, and has been described by the Southern Poverty Law Center as "virulently anti-LGBT." In his email invitation, Chief Ortiz, described the event as "an excellent opportunity to meet with some of our community members who want to show their support and publicly recognize all first responders and the excellent work that we do." After community members objected to the event, Chief Ortiz called it an "error in judgment," but only "postponed" it.

(d)  On October 7, 2020, at a City Council meeting, Councilmember Richard Schneider reported that SPPD objected to the South Pasadena High School Anti-Bias Club's request to put up a mural memorializing the local BLM protests on a wall adjacent to City Hall because SPPD perceived BLM to be "anti-police." Despite receiving support from the Arts Commission, SPPD's objection blocked the mural altogether.

**City Hires Former Police Officer to Investigate Complaints Against SPPD; Investigation Finds Violations of Hate Crime Policy but No Bias by SPPD**

73.   After months of community complaints lodged against SPPD related to the incidents over the summer and fall of 2020, on November 18, 2020, City hired a

1    retired Irvine police officer, Garon Wyatt, to investigate the complaints.

2        74.    After a six month-long investigation, the investigator sustained 21 of the

3    53 complaints against 9 of SPPD's 36 officers. The City refused to make public the

4    investigation report, or any portion of it, relying on Penal Code section 832.7,

5    dealing with the confidentiality of police personnel records, as a blanket exemption.

6        75.    However, the City did disclose high level summaries of the report,

7    which confirmed that SPPD officers at all ranks, including then Police Chief Ortiz,

8    and Defendant Wise, engaged in multiple violations of a number of policing

9    mandates, including failing to treat the incidents against Ms. James, Ms. Patterson

10   and others as potential hate crimes and failing to protect victims from future attacks.

11   *See* SPPD Policy Manual, Hate Crimes, at §§ 319 *et seq.* They also failed their

12   mandatory duties to prepare detailed, accurate and unbiased reports.  *See id*. at §

13   319.4 (c) and §§ 323 *et seq*.

14       76.    According to SPPD's Hate Crime policy in place at the time of the

15   assaults against Ms. James, "All officers **are required** to be familiar with the [Hate

16   Crime] policy and use reasonable diligence to carry out the policy unless directed by

17   the Chief of Police or other command-level officer." SPPD Policy Manual at §

18   319.2 (Policy) (Emphasis added). Among other things, SPPD officers responding to

19   reported hate crimes failed to "preserve evidence that establishes a possible hate

20   crime" *id*. § 319.4 (c), "take appropriate action to mitigate further injury or damage

21   to potential victims or the community," *id.* at § 319.4(d), and "take reasonable steps

22   to ensure that any such situation does not escalate further and should provide

23   information to the victim regarding legal aid, *id.* at §§319.4 (i).

24       77.    Further, supervisors have their own explicit mandatory obligations

25   regarding hate crimes.  According the SPPD policy manual, supervisors "**shall**

26   confer with the initial responding officer and take reasonable steps to ensure that

27   necessary preliminary actions have been taken … and **shall** request any appropriate

28   personnel necessary to accomplish the following: …(a) Provide immediate

assistance to the crime victim … [and] (b) "[t]ake reasonable steps to ensure that all relevant facts are documented on an incident and/or arrest report … (d) … in circumstances where the potential exists for subsequent hate crimes or incidents, consider directing resources to protect vulnerable sites (such as assigning an officer to specific locations that could become targets).  *Id.* at § 319.4.3.

78.    The City's own commissioned investigation determined that nearly one-third of SPPD officers, including Defendants, violated these and other department policies in responding to Ms. James and Ms. Patterson's reported assaults. But rather than address them and hold officers to account, the City quietly amended its Hate Crimes policy to eliminate its mandatory obligations. *See* https://www.southpasadenaca.gov/home/showdocument?id=19052 (current version of SPPD Policy Manual, as of October 15, 2021).

79.    As for the community complaints that SPPD officers had engaged in biased policing, the City determined they were "not sustained" or "unfounded." In response to a Public Records Act Request seeking the basis for these findings, the City refused to produce even the portion of the report identifying what standards it applied to reach its findings.

80.    In response to the limited information the City revealed about its investigation, South Pasadena community groups demanded that the City Council publicly address how it planned to rectify the many deficiencies within SPPD that the investigation revealed.  Community members were particularly concerned with the lack of finding of bias on the part of SPPD, given the mounting public evidence to the contrary as reflected in witness accounts, police reports, videos, and the press.

81.    Ms. James and Ms. Patterson joined the call to demand action from the City, particularly given their need for assurances that they could resume peaceful BLM protests and other protected activity.  When the City Council refused to engage on the issues, Ms. James and Ms. Patterson, through BLM South Pasadena, together with other community groups, filed a complaint with the California

Attorney General's Office on July 16, 2021. They asked the Attorney General to investigate SPPD's biased-policing and related deficiencies in handling hate crimes and submitted substantial evidence to support their claims.  *See* https://www.carefirstsouthpasadena.com/about-1. The Attorney General's office is in the process of reviewing the complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### First Amendment of the U.S. Constitution – Free Speech

### (42 U.S.C. § 1983)

### (By Plaintiff James Against Defendants City of South Pasadena, Bartl, Perez, Louie and Wise)

82.    Ms. James realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

83.    The First Amendment to the U.S. Constitution protects the right to be free from government abridgment of speech.

84.    Ms. James, at all relevant times, engaged in First Amendment protected free speech when she peacefully protested on matters of public interest including support for racial justice and the Black Lives Matter movement in a public forum.

85.    Defendants intentionally interfered with Ms. James' First Amendment rights of free speech and assembly, including posting signs, in support of racial justice and the Black Lives Matter movement in a public forum.

86.    Defendants violated Ms. James' First Amendment rights when, on or about July 10, 2020, Defendant Wise publicly denounced Ms. James' peaceful assembly and protest, claiming, "you guys caused this….this is wrong …. the cop hating around here … why bring this to our city."

87.    On information and belief, at all relevant times relevant, Defendant Wise was acting under the direction of Defendant Louie, and other supervisory SPPD police officers.

88.   Defendants violated Ms. James' First Amendment rights when, on or about September 22, 2020, Defendant Perez unreasonably warned Ms. James that her protest signs violated a City ordinance governing signs in the public right of way (City Municipal Code 31.2-7), and further warned her that if she did not take down her signs, SPPD would take them down for her.

89.   On information and belief, at all relevant times relevant, Defendant Perez was acting under the direction of Defendant Bartl, and other supervisory SPPD police officers.

90.   At all relevant times, Defendants Bartl, Perez, Louie, and Wise acted pursuant to a policy, custom or practice of Defendant City of depriving African Americans and BLM protestors of their right to free speech, as well as their rights to due process and equal protection of the laws.

91.   As a direct and proximate result of Defendants' violation of Ms. James' free speech rights, Ms. James experienced emotional pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

92.   Ms. James has sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James has incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

## SECOND CLAIM

## First Amendment of the U.S. Constitution – Retaliation for Free Speech

## (42 U.S.C. § 1983)

## (By Plaintiff James Against Defendants City of South Pasadena, Bartl, Perez, Louie, Wise, Ronnie, Cheney)

93.   Ms. James realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

94.   Defendants at all times relevant to this action were acting under color of state law, and/or were acting in conspiracy with other Defendants who were acting

1    under color of state law.

2        95.    Defendants intentionally interfered with Ms. James' First Amendment

3    rights of free speech and assembly, including posting signs, in support of racial

4    justice and the Black Lives Matter movement in a public forum.

5        96.    Defendants violated Ms. James' First Amendment rights when, on or

6    about July 10, 2020, Defendant Wise publicly denounced Ms. James' peaceful

7    assembly and protest in an effort to chill her protected activity, claiming, "you guys

8    caused this….this is wrong …. the cop hating around here … why bring this to our

9    city." Defendant Wise, Defendant Louie and other SPPD supervisors also retaliated

10   against Ms. James when they failed to carry out their mandatory duties to provide

11   her victim services in response to the two documented hate crimes perpetrated

12   against her by Richcreek.

13       97.    Defendants violated Ms. James First Amendment rights when, on or

14   about September 22, 2020, Defendant Perez, at the direction of Defendant Bartl, and

15   other SPPD decision-makers, improperly warned Ms. James that her protest signs

16   violated a City ordinance governing signs in the public right of way (City Municipal

17   Code 31.2-7), and further warned her that if she did not take down her signs, SPPD

18   would take them down for her, in order to chill Ms. James' First Amendment rights

19   going forward.

20       98.    Defendants also violated Ms. James First Amendment rights when, on

21   or about October 3, 2020, Defendant Ronnie directed SPPD officers not to arrest or

22   cite Defendant Cheney for intentionally driving his commercial truck onto a

23   sidewalk to stop Ms. James from putting up a protest sign, and issued a biased press

24   release indicating Defendant Cheney may have been justified in assaulting Ms.

25   James because she purportedly violated a signage ordinance, both in order to chill

26   Ms. James' First Amendment free speech rights going forward.

27       99.    At all relevant times, Defendants Bartl, Perez, Louie, Wise, and Ronnie

28   acted pursuant to a policy, custom or practice of Defendant City of depriving

African Americans and BLM protestors of their right to free speech, as well as their rights to due process and equal protection of the laws.

100. On information and belief, Defendants Bartl, Perez and Ronnie also entered into a conspiracy with Defendant Cheney to intentionally interfere with Ms. James' free speech rights at some time on or before October 3, 2020. On or before that time Defendant City unreasonably informed Defendant Cheney that Ms. James' protests signs were in violation of a City ordinance governing signs in the public right of way, which information was in contravention of a written City protocol governing enforcement of the ordinance which did not authorize SPPD to make this determination or issue a warning to Ms. James  On information and belief, from that time forward, all Defendants had at least a tacit agreement to infringe on Ms. James' First Amendment free speech rights in connection with her posting of protest signs. On information and belief, Defendants' conspiracy was motivated by their mutual bias and animosity toward African Americans and BLM supporters.

101. In furtherance of the conspiracy, in addition to the above-alleged overt acts committed by Defendants Bartl, Perez and Ronnie, on October 3, 2020, Defendant Cheney committed the overt act of driving his commercial truck onto the sidewalk to stop Ms. James from putting up a protest sign, and proceeded to call SPPD to inform Chief Ortiz that Ms. James was putting up her protest sign "again," or words to that effect, referencing Defendants' existing conspiracy to infringe on Ms. James' First Amendment right to post protest signs. Defendant Ronnie ratified Defendant Cheney's overt act in furtherance of the conspiracy by directing SPPD officers not to arrest or cite Cheney for that act, and Defendant City further ratified it when SPPD issued its biased press release justifying the act based on Ms. James' purported violation of the signage ordinance.

102. Defendants' interference with Ms. James' First Amendment free speech rights was because of Ms. James' protected activity.

103. Such conduct by Defendants chilled Ms. James' exercise of her First

Amendment free speech rights.

104.  As a direct and proximate result of Defendants' violation of her free speech rights, and as a reasonably foreseeable consequence of Defendants' overt acts in furtherance of the conspiracy to do the same, Ms. James experienced pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

105.  Ms. James has sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James has incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

**THIRD CAUSE OF ACTION**

**Violation of Civil Rights – Interference by Threat, Intimidation or Coercion**

**(Bane Act - California Civil Code § 52.1)**

**(By Plaintiff James Against Defendants City of South Pasadena, Bartl, Perez, Louie, Wise and Ronnie)**

106.  Ms. James realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

107.  Defendants have used threats, intimidation and coercion to intentionally interfere with and threaten to interfere with Ms. James' rights under the U.S. Constitution, the California Constitution, and California Civil Code § 43, as follows:

(a)    Defendants intentionally interfered with Ms. James' right to free speech and assembly under the First Amendment of the U.S. Constitution and Article I, Section 2(a) of the California Constitution, when they infringed her right to assemble and post signs in a public forum addressing matters of public interest including racial justice and support for the BLM movement and retaliated against her for doing so.

(b)    Defendants intentionally interfered with Ms. James' due process liberty interest, including her right to personal security, under the 14th Amendment to the U.S. Constitution and Article 1, Section 1 of the

California Constitution, and her right to be free from bodily restraint and harm under California Civil Code § 43, when they failed to investigate assaults against her as hate crimes, issued false and biased police reports about those assaults, and allowed her attackers to act with impunity.

(c) Defendants intentionally interfered with Ms. James' right to equal protection under the law under the 14th Amendment to the U.S. Constitution, when they enforced a signage order against her on September 22 and October 3, 2020, but not White participants of a Trump rally on November 1, 2020, on account of her race, and also when they failed to investigate assaults against her as hate crimes, issued false and biased police reports about those assaults, and allowed her attackers to act with impunity, also on account of her race.

108. On information and belief, Defendants Bartl, Perez and Ronnie also entered into a conspiracy with Defendant Cheney to use threats, intimidation and coercion to intentionally interfere with and threaten to interfere with Ms. James' rights under the U.S. Constitution, the California Constitution, and California Civil Code § 43. Defendants' conspiracy began at some time on or before October 3, 2020, at which time they engaged in the above-alleged overt acts in furtherance of the conspiracy.

109. On information and belief, Defendants Bartl, Perez and Ronnie aided and abetted Defendant Cheney's threats, intimidation and coercion to intentionally interfere with and threaten to interfere with Ms. James' rights under the U.S. Constitution, the California Constitution, and California Civil Code § 43.

110. Ms. James is entitled to an injunction pursuant to California Civil Code §52.1.

111. Ms. James is also entitled to damages pursuant to Civil Code §§ 52 and 52.1. Ms. James has filed tort claims with Defendant City of South Pasadena.

112. As a direct and proximate result of Defendants' violation of her above-

referenced civil rights, Ms. James experienced pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

113.  Ms. James has sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James has incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by Civil Code § 52. 1 and 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

### FOURTH CAUSE OF ACTION

**Violation of Civil Rights – Interference by Threat, Intimidation or Coercion**

**(Bane Act - California Civil Code § 52.1)**

**(By Plaintiff James Against Defendant Cheney)**

114.  Ms. James realleges and incorporates the allegations set forth in the preceding paragraphs as though fully set forth here.

115.  Defendant Cheney has used threats, intimidation and coercion to interfere with Ms. James' rights under the California Constitution, and California Civil Code § 43, as follows:

(a)     Defendant Cheney intentionally interfered with Ms. James' right to free speech and association under Article I, Section 2(a) and Article I, Section 3(a) of the California Constitution, and her right to be free from bodily harm under California Civil Code § 43, when he drove his commercial truck onto a sidewalk to infringe her right to put up a protest sign in a public forum addressing matters of public interest including racial justice and support for the BLM movement, and retaliated against her for doing so.

(b)     Defendant intentionally interfered with Ms. James' right to liberty, including the right to personal security, under Article I, Section 1 of the California Constitution, when he drove his commercial truck onto a sidewalk to stop her from putting up a protest sign in a public forum addressing matters of public interest including racial justice and support

for the BLM movement, and nearly hit her in the process.

116.  On information and belief, Defendant Cheney also entered into a conspiracy with Defendants Bartl, Perez and Ronnie to use threats, intimidation and coercion to intentionally interfere with and threaten to interfere with Ms. James' rights under the U.S. Constitution, the California Constitution, and California Civil Code § 43.  Defendants' conspiracy began at some time on or before October 3, 2020, at which time they engaged in the above-alleged overt acts in furtherance of the conspiracy.

117.  On information and belief, Defendant Cheney aided and abetted Defendants Bartl, Perez and Ronnie's threats, intimidation and coercion to intentionally interfere with and threaten to interfere with Ms. James' rights under the U.S. Constitution, the California Constitution, and California Civil Code § 43.

118.  Ms. James is entitled to an injunction pursuant to California Civil Code §52.1.

119.  Ms. James is also entitled to damages pursuant to Civil Code §§ 52 and 52.1. Ms. James has filed tort claims with Defendant City of South Pasadena.

120.  As a direct and proximate result of Defendants' violation of her above-referenced civil rights, Ms. James experienced pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

121.  Ms. James has sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James has incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by Civil Code § 52. 1 and 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

//

//

//

//

//

**FIFTH CLAIM**

**Fourteenth Amendment to U.S. Constitution – Due Process**

**(42 U.S.C. § 1983)**

**(By Plaintiffs James and Patterson Against Defendants City of South Pasadena, Bartl, Perez, Louie, Wise and Ronnie)**

122.  Ms. James and Ms. Patterson reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth here.

123.  Under the 14th Amendment, while "the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197 (1989).

124.  At all times relevant here, Defendants, acting under color of state law, acted pursuant to a policy, practice or custom of depriving Ms. James and Ms. Patterson of their due process liberty interest in their personal security by engaging in affirmative acts and omissions, taken with deliberate indifference to the known and obvious risk of harm to them, that exposed them to actual, particularized danger.  Defendants' affirmative acts rendered Ms. James and Ms. Patterson vulnerable to harm they would not otherwise have faced, including the foreseeable repeat attacks by Richcreek and the attack by Defendant Cheney.

125.  Defendants Wise, Louie, and Ronnie, as directed and ratified by Chief Ortiz, engaged in the following affirmative acts:

(a)     Defendants failed to follow departmental hate crimes policies designed to apprehend suspects and protect victims like Ms. James and Ms. Patterson from repeat attacks, including failing to provide for increased police protective services after Ms. James and Ms. Patterson reported

the July 8, 2020 Richcreek assault, as set forth in §§ 319.4 (c), 319.4(d), 319.4(i) and 319.4.2(c), which likely would have forestalled the assaults on July 10, 19 and October and 3, 2020;

(b)  Defendants publicly blamed Ms. James and Ms. Patterson's' protest activity for the assaults against them and took affirmative acts to allow the perpetrators Richcreek and Defendant Cheney to act with impunity. In the case of Richcreek, Defendants allowed him to do so when Richcreek threatened to assault Ms. James again on July 10, 2020, and Ms. James and Ms. Patterson again on July 19, 2020.  Defendant Wise forced Ms. James to make a citizens' arrest of Richcreek on July 10, 2020, and specifically told him, "I'm not arresting you man, SHE is," or words to that effect, referring to Ms. James. Defendant Wise also publicly accused Ms. James and her supporters, in Richcreek's presence, of being "cop hating" and bringing hate to the City.  In the case of Defendant Cheney, Defendant Ronnie admitted to Ms. James that he directed line officers not to arrest or cite Cheney because of Ms. James' purported violation of the City's signage ordinance, which decision SPPD ratified with its biased press release of the Cheney incident.

(c)  Defendants created false, inaccurate and biased police reports and press releases about the assaults against Ms. James and Ms. Patterson – including that failed to identify Ms. James and Ms. Patterson as victims of hate crimes, and also blamed Ms. James for the assaults.  Defendants did so knowing full well their actions and inactions would forestall prosecutions and increase the risk that the suspects would remain at large and have the ability to commit further assaults against Ms. James and Ms. Patterson. In the case of Richcreek, Defendants acts resulted in Richcreek assaulting Ms. James for a second time on July 10, 2020, and Ms. James and Ms. Patterson for a third time of July 19, 2020, at which

time Defendants failed to even take a police report, and on information and belief failed to record witness statements with their body cameras.

126.  On information and belief, Defendants Bartl, Perez, and Ronnie, as directed and ratified by Chief Ortiz, engaged in the affirmative act of informing Defendant Cheney that Ms. James protest signs were in violation of a City ordinance, with deliberate indifference to the known, obvious and foreseeable risk that that it would embolden Defendant Cheney to act as a vigilante to stop Ms. James from putting up her signs, which he did when he assaulted Ms. James on October 3, 2020.

127.  On information and belief, Defendant Ronnie and Chief Ortiz also engaged in the affirmative act of deciding not to arrest or cite Defendant Cheney for his October 3, 2020 assault on Ms. James, which together with Defendant Ronnie's video-taped statements to Ms. James on October 3, 2020, and SPPD's issuance of a biased press release indicating Cheney's assault was justified because Ms. James' purportedly violated the City's signage ordinance, allowed Defendant Cheney to act with impunity.

128.  Defendants acted with deliberate indifference to the known, obvious and foreseeable risk of harm to Ms. James and Ms. Patterson on account of their conduct. Ms. James' status as a BLM activist was well known to SPPD, as was the knowledge that her and Ms. Patterson's BLM protest activity would make them a greater target for assault than others in the general public, particularly given the well-documented rise of violent attacks on BLM and racial justice protesters by White supremacists, and supporters of other extremist groups that explicitly oppose BLM, like Defendant Cheney. SPPD also knew Richcreek had a long criminal history, making it foreseeable that he would act outside the law and engage in the repeat assaults that he committed against Ms. James and Ms. Patterson.

129.  Defendants also acted with deliberate indifference to the known, obvious and foreseeable risk of harm to Ms. James and Ms. Patterson on account of

their conduct when they failed to treat assaults against Ms. James and Ms. Patterson as hate crimes that require heightened investigative procedures to apprehend suspects and provide proactive victim services to ensure they are not subject to repeat attacks, as Richcreek perpetrated against Ms. James and Ms. Patterson.

130.  As a direct and proximate result of Defendants' violation of her above-referenced civil rights, Ms. James and Ms. Patterson experienced physical and emotional pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

131.  Ms. James and Ms. Patterson have sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James and Ms. Patterson have incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

## SIXTH CLAIM
## BREACH OF MANDATORY DUTIES
### (Cal Gov. Code §§ 815.6, 820)
### (By Plaintiffs James and Patterson Against
### Defendants City of South Pasadena, Wise, Louie, Ronnie)

132.  Ms. James and Ms. Patterson reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

133.  Defendants possessed mandatory duties which required them to, without limitation, use heightened procedures to investigate potential hate crimes to apprehend suspects and protect victims, and prepare accurate, detailed and unbiased reports, as set forth in SPPD Policy Manual sections 319 *et seq*. and 323 *et seq*.

134.  As described above, Defendants breached these mandatory duties.

135.  As a direct and proximate result of Defendants' violation of these above-referenced mandatory duties, Ms. James and Ms. Patterson experienced physical and emotional pain, suffering, trauma, worry, anxiety, humiliation, and embarrassment.

136.  Ms. James and Ms. Patterson have sustained general and special damages to an extent and amount to be proven at trial. In addition, Ms. James and Ms. Patterson have incurred and will continue to incur, attorney's fees and costs and expense, including those authorized by 42 U.S.C. §1988, to an extent and amount subject to proof at trial.

**SEVENTH CLAIM**

**Fourteenth Amendment to U.S. Constitution – Equal Protection**

**(By Plaintiff James Against Defendants**

**City of South Pasadena, Bartl, Perez, Wise, Louie, and Ronnie)**

137.  Ms. James reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

138.  The Fourteenth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose.  Classifications based on race receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.  *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.,* 347 U.S. 483 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

139.  Defendants' decisions on July 8, July 10, July 19 and October 3, 2020 to refuse to investigate assaults against Ms. James as hate crimes to apprehend suspects and provide her victim services, issue false and biased police reports about those assaults, and allow her attackers to act with impunity, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race.

140.  Defendants' decisions on September 22, 2020 and October 3, 2020 to discriminatorily enforce against Ms. James a City ordinance governing the posting of signs in the public right of way (City Municipal Code 31.2-7) against Ms. James was unconstitutional because they were motivated, at least in part, by intentional

1  discrimination based on race.  Defendants admittedly did not enforce the signage

2  ordinance against White Trump supporters at a Trump rally on November 1, 2020.

3      141.  As a direct and proximate result of Defendants' violation of her above-

4  referenced civil rights, Ms. James experienced pain, suffering, trauma, worry,

5  anxiety, humiliation, and embarrassment.

6      142.  Ms. James has sustained general and special damages to an extent and

7  amount to be proven at trial. In addition, Ms. James has incurred and will continue

8  to incur, attorney's fees and costs and expense, including those authorized by 42

9  U.S.C. §1988, to an extent and amount subject to proof at trial.

10  **PRAYER FOR RELIEF**

11      WHEREFORE, Plaintiffs Fahren James and Victoria Patterson respectfully

12  asks this Court to grant the following relief:

13     1.  Award compensatory and punitive damages against all Defendants for the

14        above violations of federal and state law;

15     2.  Award compensatory damages against the City of South Pasadena under the

16        California Tort Claims Act;

17     3.  Issue declaratory relief against the Defendants for the above violations of

18        federal and state law;

19     4.  Issue an injunction requiring Defendants, and anyone acting on behalf of

20        Defendants or in concert with them, to do the following:

21        a.  Refrain from violating all federal and state laws referenced herein;

22        b.  Refrain from intimidating or coercing individuals from exercising

23           their free speech rights, including their right to protest;

24        c.  Train all SPPD Officers, City Staff and the City Council on protecting

25           the right to freedom of speech and association; the identification and

26           investigation of hate crimes, together with the obligation to provide

27           resources and protective services for victims, and to prepare detailed,

28           accurate and unbiased police reports based on thorough investigations

of potential reported crimes;

    d.  Conduct an audit of all SPPD officers to identify individuals who have demonstrated bias as defined by Penal Code § 13519.4, and order the City to take appropriate action against them as required by law, and SPPD Policy Manual, section 401 *et seq.*

5.  Award prejudgment interest on any award of damages to the extent permitted by law;

6.  Award reasonable attorneys' fees, costs and disbursements, pursuant to 42 U.S.C. § 1988, Cal. Gov't Code § 52.1(h), Cal. Code of Civ. Proc. § 1021.5, and any other applicable law; and

7.  Grant any and all other such other relief as the Court deems just and equitable.

Date:  October 18, 2021

Respectfully submitted,

HOQ LAW

*/s/ Laboni A. Hoq\**
Laboni A. Hoq

SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES

*/s/ Wilmer Harris*
Wilmer Harris

V. James DeSimone Law

*/s/ V. James DeSimone*
V. James DeSimone

*Attorneys for Plaintiffs Fahren
James and Victoria Patterson*

\* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs Fahren James and Victoria Patterson hereby demand a trial by jury.

Date: October 18, 2021

Respectfully submitted,

HOQ LAW

*/s/ Laboni A. Hoq\**
Laboni A. Hoq

SCHONBRUN SEPLOW
HARRIS HOFFMAN & ZELDES

*/s/ Wilmer Harris*
Wilmer Harris

V. JAMES DESIMONE LAW

*/s/ V. James DeSimone*
V. James DeSimone

Attorneys for PLAINTIFFS,
FAHREN JAMES AND
VICTORIA PATTERSON