Laboni A. Hoq (SBN 224140)
HOQ LAW
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004
Email: laboni@hoqlaw.com

Wilmer Harris (SBN 150407)
SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
Phone: (626)441-4129
Fax: (626) 283-5770
Email: wharris@sshhzlaw.com

V. James DeSimone (SBN 119668)
V. JAMES DESIMONE LAW
13160 Mindanao Way #280
Marina Del Ray, California 90292
Telephone: (310) 693-5561
Email: vjdesimone@gmail.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

FAHREN JAMES and VICTORIA PATTERSON,

*Plaintiffs*,

v.

CITY OF SOUTH PASADENA, MATTHEW RONNIE, in his individual capacity, RANDY WISE, in his individual capacity, SPENCER LOUIE, in his individual capacity, RICHARD BARTL, in his individual capacity, CHRIS PEREZ, in his individual capacity, RICHARD CHENEY, and Does 1 through 10,

*Defendants*.

Case No: 2:21-cv-08256-DSF-KK

**PLAINTIFFS' OPPOSITION TO CITY DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Date: February 13, 2022
Time: 1:30 pm
Courtroom: 7D

District Judge: Hon. Dale S. Fischer

Complaint filed: October 18, 2021
Trial Date: September 19, 2021

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. FACTUAL AND PROCEDURAL BACKGROUND ..... 1
A. SPPD's Defiance of City's "Hands-Off" Policy To BLM Protesters ..... 1
B. SPPD's Denial of Hate Crimes Protections to BLM Supporters ..... 2
C. SPPD's Animus Toward BLM Supporters and African Americans ..... 2
III. ARGUMENT ..... 4
A. Plaintiffs Have Sufficiently Pled *Monell* Claims on Four Bases ..... 4
1. Chief Ortiz Was a "Final Policy-Making Authority" ..... 4
2. Ortiz Ratified the Officer Defendants' Constitutional Violations ..... 6
B. Defendants Violated Plaintiffs' Constitutional Rights ..... 6
1. Defendants Violated Ms. James' First Amendment Rights ..... 6
2. Defendants Conspired with Cheney to Violate Plaintiffs' Rights ..... 11
3. Defendants Violated Plaintiffs' Due Process Rights ..... 13
4. Defendants Violated Plaintiffs' Equal Protection Rights ..... 16
C. Defendants Violated the Bane Act ..... 19
D. Defendants Breached Mandatory Duties Related to Hate Crimes ..... 21
E. Plaintiffs' Sufficiently Pled a Basis for Injunctive Relief ..... 24
F. Plaintiffs are Entitled to Leave to Amend, If Need Be ..... 25
IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) .................... 4, 7, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................... 1

*Atayde v. Napa State Hosp.*,
No. 116CV00398DADSAB, 2016 WL 4943959 (E.D. Cal. Sept. 16, 2016) .................... 20, 21, 24

*Ave. 6E Invs., L.L.C. v. City of Yuma*,
818 F.3d 493 (9th Cir. 2016) .................... *passim*

*Ballew v. City of Pasadena*,
No. CV 18-0712 FMO (ASX), 2022 WL 17974488 (C.D. Cal. Nov. 23, 2022) .................... 16

*Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*,
398 F. Supp. 3d 660 (E.D. Cal. 2019) .................... 16, 20

*Boyd v. Benton Cnty.*,
374 F.3d 773 (9th Cir. 2004) .................... 8, 15

*Christie v. Iopa*,
176 F.3d 1231 (9th Cir. 1999) .................... 6

*Chuman v. Wright*,
76 F.3d 292 (9th Cir. 1996) .................... 15

*City of Canton v. Harris*,
489 U.S. 378 (1989) .................... 4

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................... 24

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
583 F.3d 690 (9th Cir. 2009) .................... 17

*Cuviello v. City & Cnty. of S.F.*,

940 F. Supp. 2d 1071 (N.D. Cal. 2013) .................................................. 11, 20

*Cuviello v. City of Vallejo*,
No. 16-cv-02584-KJM-KJN, 2020 WL 6728796 (E.D. Cal. Nov. 16, 2020) ..... ........................................................................................................ 19-20

*Doggett v. United States*,
875 F.2d 684 (9th Cir. 1988) ........................................................................21

*Erickson v. Pardus*,
551 U.S. 89 (2007) (per curiam) ..................................................................10

*Franklin v. Fox*,
312 F.3d 423 (9th Cir. 2002) ....................................................................... 13

*Gifford v. Hornbrook Fire Prot. Dist.*,
No. 2:16-CV-0596-JAM-DMC, 2021 WL 4168532 (E.D. Cal. Sept. 14, 2021) . ........................................................................................................ ........................................................................................................ 20

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999) ....................................................................... 13

*Gonzalez v. United States*,
814 F.3d 1022 (9th Cir. 2016) ..................................................................... 23

*Haggis v. City of Los Angeles*,
22 Cal. 4th 490, 993 P.2d 983 (2000) ......................................................... 22

*Hernandez v. City of San Jose*,
897 F.3d 1125 (9th Cir. 2018) ......................................................................15

*Holland v. City of San Francisco*,
No. C10-2603 TEH, 2013 WL 968295 (N.D. Cal. Mar. 12, 2013) ..................20

*Index Newspapers L.L.C. v. U.S. Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ......................................................................... 7

*Jett v. Dallas Indep. Sch. Dist*,
491 U.S. 701 (1989) .........................................................................................5

*Johnson v. Shasta Cnty.*,
83 F. Supp. 3d 918 (E.D. Cal. 2015)...........................................................20, 21

*Kennedy v. Ridgefield City*,
439 F.3d 1055 (9th Cir. 2006) .......................................................................... 14
*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012) ...........................................................................18
*Laird v. Tatum*,
408 U.S. 1 (1972) ............................................................................................... 9
*Lytle v. Carl*,
382 F.3d 978 (9th Cir. 2004) ...........................................................................5
*Martinez v. City of Clovis*,
943 F.3d 1260 (9th Cir. 2019) .......................................................................... 15
*Martinez v. Cnty. of Sonoma*,
No. 15-CV-01953-JST, 2015 WL 5354071 (N.D. Cal. Sept. 14, 2015) ......... 20
*Mendocino Env't Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) .......................................................................... 11
*Mendoza v. Princess House, Inc.*,
No. 521CV01491FWSSHK, 2022 WL 3574449 (C.D. Cal. July 8, 2022) .....25
*Metzler Inv. GmbH v. Corinthian Colls. Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......................................................................... 25
*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ..........................................................................................4
*NAACP of San Jose/Silicon Valley v. City of San Jose*,
562 F. Supp. 3d 382 (N.D. Cal. 2021) .............................................................. 16
*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) ............................................................................................ 19
*Richter v. Ausmus*,
No. 19-CV-08300-WHO, 2021 WL 580055 (N.D. Cal. Feb. 16, 2021) ......... 20
*Sanderlin v. City of San Jose*,
No. 20-CV-04824-BLF, 2022 WL 913055 (N.D. Cal. Mar. 29, 2022) ..........7, 8
*Serrano v. Francis*,

345 F.3d 1071 (9th Cir. 2003) .......... 16

*Shoyoye v. County of Los Angeles*,
203 Cal.App.4th 947, 137 Cal.Rptr.3d 839 (2012) .......... 21

*Smith v. Cnty. of Santa Cruz*,
2020 WL 6318705 (N.D. Cal. Oct. 28, 2020) .......... 20

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .......... 9

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) .......... 25

*Ulrich v. City & Cnty. of S.F.*,
308 F.3d 968 (9th Cir. 2002) .......... 6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 16

*Washington v. Davis*,
426 U.S. 229, 96 S.Ct. 2040 (1976) .......... 17

*Watison v. Carter*,
668 F.3d 1108 (9th Cir. 2012) .......... 25

*White v. Sacramento Police Dep't*,
No. 2:21-CV-02211-JAM-DB, 2022 WL 2052596 (E.D. Cal. June 7, 2022) .......... 16, 19

*Whren v. United States*,
517 U.S. 806, 116 S.Ct. 1769 (1996) .......... 18

**Statutes**

Civ. Code § 52.1(k) .......... 20

Gov. Code § 815.6 .......... 23

Penal Code § 422.87(a)(6) .......... 21, 22

Penal Code § 422.92 .......... 22

Penal Code § 422.92(a) .......... 22

Penal Code § 13519.6(c) .......... 21

**Rules**

Fed. R. Civ. P. 15 .......................................................................................... 25

## I. INTRODUCTION

The Court should deny the City Defendants motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") in light of the new and previously pled facts alleged therein, which plausibly state viable claims for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). The SAC amply alleges facts supporting Plaintiffs' claims that the City Defendants engaged in a policy, practice and custom of violating Plaintiffs Black Lives Matter ("BLM") protestors' Constitutional and state statutory rights, including the City's mandatory Hate Crimes duties. To the extent the Court determines the SAC fails to plead sufficient facts, because ongoing discovery in this matter will likely bolster the claims, the Court should grant leave to amend.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Court's November 3, 2022 Order ("Order") granting in part and denying in part the City Defendants' Motion to Dismiss First Amended Complaint ("FAC") fairly sets forth the allegations in the case. *See* Order at 1-8. The additional facts alleged in the SAC as compared to the FAC are redlined in Exhibit ("Ex.") A to the Declaration of Laboni Hoq ("Hoq Decl."), and highlighted below.

### A. SPPD's Defiance of City's "Hands-Off" Policy To BLM Protesters

Early in the summer of 2020, in response to the murder of George Floyd and the ensuing BLM protests, and appreciating the community's need for civic engagement, the City instituted a "hands off" policy towards the protesters so long as they demonstrated peacefully. SAC ¶ 82. This meant that the City would not enforce technical municipal code violations against the protesters, including posting signs on public property. *Id.* ¶ 82, 84.  SPPD Officers were well aware of this "hands off" policy, and in compliance with it and existing practice that the City's Public Works department was responsible for sign enforcement, they took no action against BLM protesters' sign placement for several months. *Id.* ¶¶ 82-84, 88. However, on September 22 and October 3, in defiance of the hands-off policy, and in connection with complaints by Defendant Cheney with who SPPD shared animus

toward BLM, SPPD enforced the ordinance against Ms. James' protest signs.

**B. SPPD's Denial of Hate Crimes Protections to BLM Supporters**

Also early in the summer of 2020, based on their antipathy to BLM, SPPD made a blanket determination that individuals targeted for their BLM protest activity did not meet the definition of victims afforded protections by intentionally misinterpreting hate crimes statutes, Penal Code §§ 422.5, 422.6. SAC ¶¶ 5, 29, 36, 4, 54, 58, 71, 104, 172(b) and (c), 192(a), 196. SPPD made this determination as early as July 1, 2020, in response to reports of nails found in the driveways of residents displaying "Black Lives Matter" signs on their property. SAC ¶¶ 28-29.

Based on this blanket policy, SPPD also declined to treat subsequent assaults and vandalism against Plaintiffs and other BLM supporters as potential hate crimes, including on July 8, 10, 19, August 30, October 3, November 1, 2020, and January 2021. SAC ¶¶ 28, 29, 41-46, 52-59, 62-66, 71, 75, 80-81, 102, 104, 109, 112, 115, 136, 128-129. By failing to do so, SPPD violated its mandatory obligations under California Penal Code statutes, including Penal Code § 422.87, requiring it to provide officers a "checklist of first responder responsibilities," and victims a "hate crimes brochure, as required by [Penal Code] § 422.92."

**C. SPPD's Animus Toward BLM Supporters and African Americans**

SPPD's anti-BLM sentiment is well-documented, and became so acute, that in August and September 2020, City Council members held a series of meetings with SPPD officers to address their "morale" issues, where officers openly expressed their anti-BLM animus. *Id*. Thereafter, on or around September 24, Chief Ortiz promoted a "prayer breakfast" for SPPD sponsored by a documented hate group, which was intended to counter BLM and its perceived anti-police stance. *Id*. ¶ 122. In an email Ortiz directed then Deputy Chief Solinsky (now Chief Solinsky) to draft inviting all SPPD officers to the event, it stated, "Given the current political climate, this is a great opportunity to meet with some of our community members who are willing to publicly show their support for us and the job we do." *Id*.

SPPD's animus towards BLM and African Americans was on full display at the November 1 Trump rally, where they engaged gratuitous denigration of BLM supporters, and favoritism to the Trump "MAGA" supporters who oppose. ¶¶ 90-91.[1] They failed to cite a single Trump supporter for blatant violations, including of a municipal code prohibiting merchandise sales without a permit, which led to MAGA vendor assaulting a youth BLM supporter. *Id*. Body camera footage shows that upon arriving at the scene, Defendant Ronnie questioned whether the "usual suspects" were present, *id*. ¶ 114, a clear reference to Ms. James and Mr. Lang, who were well known to SPPD as the leaders of the BLM protests. Ronnie and other officers also denigrate then City Council member Stephen Rossi, who was on the scene in response to constituents' complaints about SPPD's mishandling of the situation, with an officer calling Rossie an "asshole," with Ronnie unphased. *Id*. ¶ 112. Defendant Perez jokes to a group of officers about "arrest[ing] [Fahren] for a misdemeanor" for smoking in public, referring to Ms. James by her first name, showing she was well-known at SPPD, and perceived with disdain. *Id*. ¶ 92, 114.

After the City commissioned the Wyatt investigation into the growing complaints into SPPD's bias, the City determined that there are members of the "Oath Keepers" on the City's police force, a group well-known for supporting vigilantism, whose prominent members are anti-BLM and pro White nationalist. SAC ¶ 131. While this information was communicated to all City Council Members, on information and belief, the City has taken no action to address these extremists on its police force, as required by its Bias-Based Policing Policy. *Id*.

In support of allegations of SPPD's racial animus toward Ms. James, the SAC alleges a recent study finding SPPD disproportionately targets African Americans for arrest, suggesting "the existence of racially biased policing practices." *Id*. ¶ 144.

---

[1] *See* Sarah Slobin and Sam Hart, When the right wing rallies, Reuters, April 15, 2021, available at https://www.reuters.com/graphics/USA-CAPITOL/SECURITY/xegpbxoadpq/

## III. ARGUMENT

### A. Plaintiffs Have Sufficiently Pled *Monell* Claims on Four Bases

In its November 3 Order, the Court held that Plaintiffs sufficiently alleged *Monell* liability against the City for violation of Plaintiffs' First and 14th Amendment due process rights based two of the four grounds Plaintiffs asserted[2] – that the City has a "longstanding practice or custom" of discriminating against Ms. James, BLM protesters and African Americans, and that SPPD failed to train its officers on their mandatory duties under its Hate Crimes policy.[3] Order at 33; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Because the SAC alleges additional facts to support the two additional grounds for *Monell* liability previously asserted – that then Police Chief Joe Ortiz was an official policymaker who violated Plaintiffs Constitutional rights, and that he "ratified" SPPD officers' unconstitutional actions – the Court should uphold Plaintiffs' *Monell* claims and all four asserted grounds.[4]

#### 1. Chief Ortiz Was a "Final Policy-Making Authority"

The Court previously denied *Monell* liability based on Chief Ortiz as a final policy-maker for two reasons, Order at 35, which the SAC overcomes as follows. *First*, as to the October 3 incident, the Court held that the FAC only alleged "Chief Ortiz granted Ronnie the power to make the decision, not that he made the decision

---

[2] Plaintiffs discuss in section III.B.4., *infra*, their right to *Monell* liability against the City in the context of the Officer Defendants' Equal Protection violations.

[3] In their Motion, Defendants make no arguments against these two grounds of *Monell* liability, thus waiving them. *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999).

[4] The SAC also alleges additional facts to support the "longstanding practice or custom" as well as the failure to train grounds for *Monell* liability, including as discussed in section II. A. and B., *supra*, including SPPD's decision to ignore the hands-off policy towards peaceful protestors and its blanket denial of hate crimes protections to BLM supporters, respectively.

himself," to not arrest or cite Cheney for assaulting Ms. James. *Id*. The SAC now alleges that while Ronnie gave the order to officers at the scene not to cite Cheney, "Chief Ortiz was ultimately the one who made the decision 'because of the gravity of the situation. Because of the political element of what [was] is going on.'" SAC ¶¶ 100-101; *see also id*. ¶ 102 ("Ronnie also tried to rationalize ***his and Chief Ortiz's decision*** not to take action against Cheney based on Ms. James' purported violation of the signage ordinance.")(Emphasis added).

*Second*, in response to the Court's finding that the FAC did not sufficiently allege "Chief Ortiz 'fostered a culture of anti-BLM, anti-Black, and pro-White supremacy throughout the police force,'" the SAC states the following facts to support these allegations: (1) anti-BLM sentiment at SPPD became so acute that City Council Members held a series of meetings to address it, SAC ¶¶ 124-126, (2) Ortiz's decisions to defy the City's "hands off policy" toward BLM supporters when he authorized Defendants Bartl, Perez and Louie to enforce the signage ordinance against Ms. James on September 22 and October 3, SAC ¶¶ 88, 90, 97, (3) Ortiz's support for a prayer breakfast honoring SPPD hosted by a known hate group, which a draft email reveals was intended to counter the BLM protestors' perceived anti-police messaging, (4) complaints of anti-BLM sentiment at SPPD went far beyond just those made by Plaintiffs, and against the named Defendants, SAC ¶¶ 128-132.

The City Defendants wrongly argue that Chief Ortiz was not the final policymaker for purposes of *Monell* liability based solely on a truncated excerpt of the City Charter. Mot. at 3-5. While the City Charter may be one source of information regarding who constitutes a final policymaker, courts must also look to how "a local government entity operates in practice," which here militates in favor of Chief Ortiz as a final policymaker. *Lytle v. Carl*, 382 F.3d 978, 982-3 (9th Cir. 2004) ("A municipal employee may act as a de facto policymaker under § 1983 without explicit authority under state law") (*citing Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (trial judge must identify official policymakers based on

"state and local positive law, *as well as custom or usage* having the force of law") (emphasis added).

Indeed, even the truncated excerpt of the City Charter leaves open the possibility that the City Manger can delegate final policymaking authority to the police chief. City Defendant's Request for Judicial Notice ("RJN"), Ex. A at 6 (City Manager "shall have the authority to control, order and give directions to all heads of departments," including the chief of police.). Here, the City Manager likely did delegate final policymaking authority to Ortiz, when he repeatedly failed to overrule his unconstitutional acts. SAC ¶ 106. At best, Defendants arguments create a factual dispute which cannot be decided at the pleading stage. *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 985–86 (9th Cir. 2002) (regarding whether there was "delegation [of] final policymaking authority … may turn on questions of fact").

**2. Ortiz Ratified the Officer Defendants' Constitutional Violations**

In denying *Monell* liability based on ratification, the Court held that the FAC failed to allege that Chief Ortiz's involvement in the unconstitutional acts of his subordinates amounted to "more than acquiescence." Order at 36. (quotations and citations omitted). In response, the SAC makes clear that Ortiz actually directed the constitutional violations at issue, including relating to the October 3 incident. SAC ¶ 101. The SAC also alleges facts that plausibly support Ortiz's affirmative approval of decisions by his subordinates to not treat several of the assaults against Plaintiffs as hate or other crimes, including on July 8, SAC ¶ 44, the July 10, *id.* ¶ 65, and July 19, *id.* ¶ 70-71. These allegations are sufficient to state *Monell* claims based on ratification, particularly where "[o]rdinarily, ratification is a question for the jury." *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999).

**B. Defendants Violated Plaintiffs' Constitutional Rights**

**1. Defendants Violated Ms. James' First Amendment Rights**

The SAC sufficiently pleads First Amendment claims against all Defendants. To state claims for First Amendment violations, "Plaintiffs must plead (1) they were

engaged in a constitutionally protected activity; (2) Defendants' actions would 'chill a person of ordinary firmness from continuing to engage in the protected behavior;' and (3) 'the protected activity was a substantial or motivating factor in [Defendants'] conduct.' The [third] element … can be demonstrated 'through direct or circumstantial evidence' and 'involves questions of fact that should normally be left for trial.'" *Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2022 WL 913055, at *7 (N.D. Cal. Mar. 29, 2022) (citing *Index Newspapers L.L.C. v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)).

Regarding **Defendants Wise and Ronnie**, in its November 3 Order the Court held that the FAC sufficiently alleged First Amendment claims against them. Order at 37. In their Motion, the City Defendants make no arguments against these claims. Because the SAC maintains and expands Plaintiffs' First Amendment allegations against Wise and Ronnie, SAC ¶ 60-66, the Court should deny Defendants' Motion to dismiss them. *Alaska Ctr. for the Env't*, 189 F.3d at 858 n.4. ("Arguments not raised in opening brief are waived.").

**Regarding Defendant Louie**, in its November 3 Order the Court dismissed Plaintiffs First Amendment claims against him because the FAC failed to sufficiently plead the second and third prongs of the claim. Order at 13. Because the SAC pleads facts to overcome these findings, and because Louie's conduct gives rise to supervisory liability, these claims against him should be upheld.

First, regarding the Court's finding that Plaintiffs failed to "plausibly allege that Louie's" conduct "was motivated by James's involvement with the BLM movement or protest," Order at 13, Plaintiffs allege that Louie not only failed to correct Wise's biased representations about BLM in his police report, but that he affirmatively agreed with them and instructed Wise to keep them in the report. SAC ¶¶ 58-60. These allegations are particularly plausible in light of the now expanded allegations of widespread anti-BLM sentiment throughout the police force, as discussed in section II. C., *supra*. *See Ave. 6E Invs., L.L.C. v. City of Yuma*, 818

F.3d 493, 504 (9th Cir. 2016) ("[t]he presence of community animus can support a finding of discriminatory motives by government officials"). At the pleading stage, such allegations are sufficient to uphold claims against Louie. *See Sanderlin*, 2022 WL 913055, at *7 (animus "can be demonstrated 'through direct or circumstantial evidence' and 'involves questions of fact that should normally be left for trial.'").

Together with the backdrop of Louie's affirmative bias against the BLM protestors, SAC ¶ 55, 58-60, 120, allegations of his shoddy approach to investigating Richcreek's July 10 assault on Ms. James further plausibly supports his animus, and does not require that his "actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). As alleged in the SAC, when Wise left the scene on July 10, Louie together with his subordinate Officer Valdez carried out a slap-dash interview of Ms. James about Richcreek's assault, in violation of basic investigative procedures, and passed on false and biased facts for Wise to incorporate into his police report. SAC ¶¶ 51-54, 58. These facts plausibly allege Louie's animus here. *Sanderlin*, 2022 WL 913055, at *7.

Second, regarding the Court's finding that Plaintiffs "fail[ed] to provide factual allegations that Louie's act 'would chill or silence a person of ordinary firmness from' engaging in future BLM protests," Order at 13, the SAC plausibly alleges the objective chilling effect of Louie's conduct. *See* SAC ¶¶ 60-66. Alan Ehrlich, a City Public Safety Commissioner, who was at the scene on July 10, personally witnessed and reported to Chief Ortiz and others the distress Ms. James suffered on account of Louie and other SPPD officers' dismissive treatment of her. *Id.* ¶¶ 55, 56. Ms. James was aware that Defendant Louie was Wise's superior officer upon receiving a copy of the police report of the July 10 incident, which Louie signed as the supervising officer. SAC ¶ 60. Faced with a supervising officer who allowed his subordinate to act with such overt bias against a crime victim, himself treated her in a callous and sub-standard way, and approved a false and

biased police report, these facts rise to the level of objective chill required to sustain a First Amendment claim. Order at 13. The fact that Ms. James did not actually stop her First Amendment activities in response to Louie's chilling conduct is irrelevant, Order at 11, particularly where she has alleged that after this incident she was "on edge every time [she] returned to protest." SAC ¶ 73.[5]

Finally, Louie is also liable for violating Ms. James' First Amendment rights on a theory of supervisory liability under section 1983. "[T]he supervisor's participation could include his 'own culpable action or inaction in the training, supervision, or control of his subordinates,' 'his acquiescence in the constitutional deprivations of which the complaint is made,' or 'conduct that showed a reckless or callous indifference to the rights of others.'" *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011). As discussed above, and in the SAC, Louie integrally participated in Wise's constitutional violations, including when he witnessed Wise's favoritism toward Richcreek and did nothing to correct it, SAC ¶¶ 51-59, failed to carry out his own duties to properly interview Ms. James and report accurate information, *id.*, and contributed to and specifically affirmed Wise's biased police report, *id.*

**Regarding Defendants Perez and Bartl**, the SAC plausibly alleges facts to overcome the Court's determination that "James fails to allege facts demonstrating her 'protected activity was a substantial or motivating factor in the defendant's conduct.'" Order at 13-14. First, as discussed in section II.C. *supra*, Bartl and Perez's conduct must be understood in context of the larger anti-BLM sentiment that permeated throughout SPPD, which the SAC plausibly alleges Bartl and Perez personally espoused. *See Ave. 6E Invs.*, 818 F.3d at 504. Despite the existence of a "hands off" policy towards peaceful BLM supporters in place for three months,

---

[5] The City Defendants reliance on *Laird v. Tatum*, 408 U.S. 1, 15 (1972) is wholly inapposite. In *Laird*, the plaintiffs alleged a chilling effect based on a surveillance program that they admitted did not cause them any harm or realistic threats of future harm. That is not the case here, where Plaintiff amply allege both present and future harm. *See* SAC ¶¶ 66, 73, 140.

SAC ¶¶ 82-83, Bartl and Perez defied that policy on September 22. The City's Sign Placement and Enforcement Protocol, established a week later on September 30, 2020, does not exonerate Bartl and Perez, because it only memorialized existing practice before Bartl and Perez deviated from it. SAC ¶ 84-88.

Despite Defendants' baseless and implausible claim, *nowhere* in the Protocol does it state that it was "reassigning sign enforcement authority from SPPD to Public Works," or that SPPD was *ever* tasked with sign enforcement. Motion at 10; *see also* City Defendants' RJN at ¶ 3, Ex. C. To the contrary, Public Works was primarily tasked with that responsibility as documented in the City's Customer Care Log, and the lack of any documentation that SPPD directly responded to sign complaints. SAC ¶ 82-84, 88. As such, the Court cannot credit Defendants' baseless claims about the Protocol over Plaintiffs' plausible allegations to the contrary. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (courts must "accept as true all of the factual allegations contained in the complaint").

A more plausible understanding of the Protocol is that it was created in response to Public Safety Commissioner Alan Ehrlich's email to SPPD on September 24, 2020, copying the City Manager and the City Attorney, questioning Bartl and Perez's attempt to enforce the signage ordinance as a potential First Amendment violation. SAC ¶ 86. Given the context and timing of the creation of the Protocol, the City's claim that its purpose was simply to "reassign" SPPD away sign enforcement is not only implausible, but hardly "so convincing that [Plaintiffs'] explanation is implausible," that it warrants dismissal. *Starr*, 652 F.3d at 1216-17.

Regarding Plaintiffs' allegations that Bartl and Perez selectively enforced the signage ordinance against Plaintiffs on September 22, and not against the Trump supporters at the Trump rally on November 1, this allegation is bolstered by the following additional facts. First, while it is true that by the time of the Trump Rally the Sign Protocol explicitly prohibited SPPD from enforcing the signage ordinance against protesters, at that time SPPD also refused to enforce a separate ordinance

against the Trump supporters that it was tasked to enforce, demonstrating its favoritism to them. SAC ¶ 90-91, Plaintiffs' RJN at Ex. A.

Regarding the chilling effect of Bartl and Perez' conduct on Ms. James, as discussed, the SAC alleges that Ms. James witnessed them single her out for negative treatment on September 22, and also show favoritism toward those who opposed her BLM messaging on November 1. Both of these actions "would chill or silence a person of ordinary firmness" from engaging in future BLM protests. *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999). Indeed, after the September 22 incident, Ms. James sought the counsel of Public Safety Commissioner Ehrlich to assure herself of the legality of her protest activity before she proceeded with her protests. SAC ¶ 86. Regarding Bartl, Perez and other officers' conduct at the Trump rally, the favoritism she witnessed them offer Trump supporters, in the face of their assault of a youth BLM supporter, further chilled her protest activity, and she determined not to resume protest activity until the City held SPPD to account. SAC ¶ 90-92, 107-117, 140.[6]

### 2. Defendants Conspired with Cheney to Violate Plaintiffs' Rights

The SAC plausibly alleges a conspiracy between Ortiz, Bartl, Perez Ronnie and Cheney to violate Plaintiffs' First Amendment rights. Defendants argue that Plaintiffs' fail to "'defin[e] the scope of any conspiracy..., what role [a conspirator] had, or when and how the conspiracy operated, [citation.]" Motion at 12 (*Cuviello v. City & Cnty. of S.F.*, 940 F. Supp. 2d 1071, 1098 (N.D. Cal. 2013)). However, the SAC does all of this and more, making clear that the purpose of the conspiracy was to intimidate Ms. James into curtailing her protest activity based on Defendants shared animus to BLM and African Americans. SAC ¶¶ 89-105.

The conspiracy originated on or about September 22, when, on information and belief, Cheney complained to Bartl, Perez and Ronnie about Ms. James' protest

[6] Despite Defendants' baseless claim, Mot. at 11, there are no allegations in the SAC that Ms. James continued her BLM protest activity in the City after November 1.

signs. *Id.* ¶ 95. On information and belief, Cheney also complained directly to Chief Ortiz, with who he had a prior relationship. *Id.* ¶ 96. Around that time, these Defendants, together with Ortiz, came to a meeting of the minds about their common opposition to Ms. James and her BLM protests, knowing that each would give each other cover for their unlawful actions against her. For example, Bartl and Perez could attribute their threat to seize Ms. James' signs to Cheney's complaints, *id*. ¶ 97, when their true motivation was animus against Ms. James, evidenced by their defiance of the City's "hands-off" policy toward peaceful protesters.

The SAC also alleges that Defendants told Cheney that SPPD had warned Ms. James about her signs, thereby emboldening Cheney to assault Ms. James on October 3, knowing SPPD would provide him cover. *Id*. ¶ 95. Cheney told officers at the scene just after the assault that he knew Ms. James had been warned about her signs multiple times, information he could only have obtained from Defendants. *Id*. ¶ 95. Ronnie, too, was explicit in acknowledging that he and Chief Ortiz decided not to arrest or cite Cheney because of complaints about her signs, referencing Cheney's complaints, including just that morning when he announced he would "call Chief Ortiz." *Id*. ¶ 93. Demonstrating his animus to Ms. James and BLM, Ronnie enforced the signage ordinance in defiance of the Sign Protocol, which action SPPD ratified with its biased press release. *Id*. ¶ 102.

The allegations in the SAC also overcome the Court's determination with "[w]ith respect to Perez and Bartl [that] … Plaintiffs fail to allege any facts permitting an inference that they had any bias or animosity towards African Americans or BLM supporters." Order at 17. *See also* sections II.C. and III. B.1., *supra*. As discussed above, their animus can be inferred from the prevalent anti-BLM sentiment that permeated throughout SPPD ranks, *see* id.; section II.C; *Ave. 6E Invs.*, 818 F.3d at 504. It can also be inferred for their individual conduct. Regarding Perez, he revealed his animus when he joked with a group of officers at Ms. James expense suggesting SPPD should "arrest Fahren" for the "misdemeanor"

of smoking in public. *Id.* ¶ 114. Regarding Bartl, a supervising officer at the Trump rally, his bias was evident when he failed to hold a Trump merchandise vendor who assaulted a pro BLM youth accountable for her violation of the City's merchandise ordinance, in contrast to his improper warning to seize Ms. James' signs on September 22 in defiance of the City's hands-off policy. *Id.* ¶¶ 115-117.

Likewise, the SAC sufficiently "support[s] an inference that [Ronnie] and Cheney had a 'meeting of the minds to violate constitutional rights.'" Order at 17; *see Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) ("To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856–57 (9th Cir. 1999) ("knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions." (citations and quotations omitted). Here, the SAC states multiple facts plausibly alleging a "meeting of the minds," between Ronnie and Cheney, including: (1) Cheney's complaint to Ortiz, Bartl, Perez and Ronnie about Ms. James' signs, and their relaying to him that SPPD warned Ms. James about her signs, thus emboldening Cheney's vigilantism on October 3, SAC ¶ 95, (2) Ronnie's refusal to cite Cheney for assaulting Ms. James on October 3, attributing the decision to Cheney's complaint about her purported violation of the ordinance, *id.* ¶¶ 101, 102, (3) Ronnie met with Ms. James on the day he refused to arrest or cite Cheney wearing a "Thin Blue Line" mask, a symbol of his anti-BLM sentiment, *id.* ¶ 100, which he shared with Cheney, a supporter of anti-BLM and pro White nationalist groups like the Proud Boys, *id.* ¶ 93, 94.

### 3. Defendants Violated Plaintiffs' Due Process Rights

In its November 3 Order, the Court upheld Plaintiffs' 14th Amendment due process claims against Wise, Ronnie, Bartl and Perez. Order at 37. Because the SAC maintains and supplements the allegations in support of these claims, and the City Defendants advance no arguments that would justify the Court departure from its

prior ruling, the City Defendants Motion to dismiss these claims should be denied. *Alaska*, 189 F.3d at 858 n. 4.

While the Court denied Plaintiffs due process claim for their failure to carry out their duties under hate crimes statutes and the SPPD Hate Crimes Policy, Order at 19, new facts alleged in the SAC establish that Plaintiffs' due process claims on this ground should be upheld as well. Further, regarding Plaintiffs' due process claims against Louie, both new facts alleged in the SAC, coupled with Louie's supervisory liability are sufficient to maintain these claims.

Regarding Defendants' due process liability related to SPPD's Hate Crimes Policy, the SAC alleges that all Defendants' blanket policy to deny BLM supporters hate crimes protections "'affirmatively place[d] [Plaintiffs] in a position of danger … [they] would not have otherwise faced.'" Order at 18 (*citing Kennedy v. Ridgefield City*, 439 F.3d 1055, 1061 (9th Cir. 2006)); SAC ¶¶ 29, 36, 44, 54, 81, 104, 134. Had SPPD not had this blanket affirmative policy in place, which the Wyatt investigation found violated the Hate Crimes Policy, *id*. ¶¶ 134-136, section II.B., *supra*, Plaintiffs would have had access to victims' assistance that could have forestalled repeat attacks. For example, if in response to the first July 8 Richcreek assault, SPPD officers provided Plaintiffs with a copy of the Hate Crimes brochure, they could have accessed the resources listed therein to obtain a restraining order to forestall the two further Richcreek assaults. Plaintiffs' RJN at Ex. D. However, because SPPD's top brass not only failed train line officers on the Hate Crimes policy, but also affirmatively withheld resources such as the Hate Crimes brochure and the Checklist for first responders from BLM victims, Plaintiffs suffered repeat attacks. SAC ¶¶ 32-34, 44 (Deputy Chief Solinsky took it on himself to determine whether the July 8 incident was a hate crime and declined to designate it as such). Regardless of whether the Hate Crimes Policy imposes mandatory duties, that SPPD officers were intentionally not instructed to offer BLM supporters hate crimes protections and were denied access to hate crimes resources, this left Plaintiffs

worse off than if SPPD had allowed officers to apply the Policy on the books.

Regarding **Defendant Louie**, Plaintiffs have sufficiently plead that he "integral[ly] participate[d]" in Wise's conduct, resulting in due process liability against him. *See Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996); *Boyd*, 374 F.3d at 780. As discussed in section III.B.1, *supra*, Louie, a Sergeant, was Corporal Wise's superior officer, who witnessed and condoned Wise's unlawful actions, including his bias toward Ms. James and his favoritism toward her attacker Richcreek. SAC ¶¶ 49-58. Louie's conduct left Richcreek with the impression that he could act with impunity, as he watched Wise and Louie operate in coordination. This prompted Richcreek to try to curry favor with the officers at the scene by claiming with respect to his assault on Plaintiffs, "I'm doing this for you guys." *Id.* ¶ 48. Indeed, Louie not only ratified Wise's unlawful conduct, but also contributed to it by passing on false and biased information to include in his police report. *Id.* ¶¶ 53, 54. Taken together, Louie's conduct "exposed Plaintiffs to an actual, particularized danger they would not otherwise have faced," *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019), including the July 19 attack. FAC ¶ 58.

Likewise, regarding Ronnie and SPPD's decision to issue a biased press release blaming Ms. James for Cheney's attack, this too "ma[de] the situation worse" for Plaintiffs. Order at 19. The press release made public SPPD's bias against Ms. James and BLM protesters. This, like Wise's disparaging comments about BLM to Richcreek and a crowd of witnesses to the July 10 incident, Order at 22-23, is an affirmative act that would encourage, embolden or incite others to continue violence against Plaintiffs. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018). The press release "left [Plaintiffs] in a situation that was more dangerous than the one in which [Defendants] found [them]." *Id.* Indeed, a month later Trump "MAGA" supporters descended on the City, and were emboldened to assault a BLM youth protester. SAC ¶ 110.

//

### 4. Defendants Violated Plaintiffs' Equal Protection Rights

In its November 3 Order, the Court dismissed Plaintiffs' 14th Amendment Equal Protection claims against both the City and all Officer Defendants. Order at 28. The SAC now alleges new facts to support these claims.

Plaintiffs' Equal Protection claims allege Defendants discriminated against Ms. James on account of her race, and both Ms. James and Ms. Patterson on account of their pro-BLM viewpoints. Even though "[t]he central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose[,]"a plaintiff is not required "to prove that the challenged action rested solely on [a] racially discriminatory purpose[.]" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*, 398 F. Supp. 3d 660, 679 (E.D. Cal. 2019) (upholding Ralph Act claim where BLM protesters alleged animus based on "their affiliation with BLM, a political organization," and that "defendants were motivated by plaintiffs' race"); *White v. Sacramento Police Dep't*, No. 2:21-CV-02211-JAM-DB, 2022 WL 2052596, at *6 (E.D. Cal. June 7, 2022) (upholding Equal Protection claim based on viewpoint discrimination).

In dismissing Plaintiffs' Equal Protection claims, the Court held that "James does not sufficiently connect Defendant Officers' alleged anti-BLM sentiment with her assertion that they discriminated against her based on her race." Order at 27. However, "[i]t is sufficient if the 'defendant acted at least in part because of a plaintiff's protected status.'" *Ballew v. City of Pasadena*, No. CV 18-0712 FMO (ASX), 2022 WL 17974488, at *7 (C.D. Cal. Nov. 23, 2022) (citing *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003)); *cf. NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 404 (N.D. Cal. 2021) (acknowledging BLM viewpoint discrimination claim "relates to the issue of ethnicity"). Here, the SAC alleges numerous allegations that the Officer Defendants' discriminatory conduct was plausibly motivated by *both* Ms. James' race and her

support of BLM. *See* SAC ¶¶ 48, 49, 51, 54, 58, 59, 94-105, 114.[7]

The SAC further alleges the existence of statistical evidence that SPPD Officers disproportionately target African Americans and Latinos for arrest, and that "[s]uch disparities suggest the existence of racially biased policing practices." SAC ¶ 144. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [government action] bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048-49 (1976); *see also Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) ("'gross statistical disparities,' can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy").

Ms. James also alleges the racially differential treatment she received from Defendants and other SPPD Officers relative to her fellow White BLM protester Ms. Patterson. *Washington*, 426 U.S. at 229 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is

---

[7] The SAC alleges: (1) Wise showed favoritism to Richcreek, the White perpetrator of the July 10 assault on Ms. James, SAC ¶¶ 49, 51, (2) Wise made denigrating comments to Ms. James and her brother Mr. Lang, claiming "you guys caused this," *id*. ¶ 48, *Ave. 6E Invs*., 818 F.3d at 505 (holding that "code words" … "may demonstrate discriminatory intent"), (3) Wise and Louie failed to treat the July 10 incident as a hate crime, despite Richcreek's racist comments to Ms. James, *id*. ¶¶ 54, 58, 59, (4) Ronnie and Ortiz showed favoritism toward Cheney, the White perpetrator of the October 3 assault on Ms. James, *id*. ¶¶ 94-102, (5) Ronnie and others at SPPD failed to treat the October 3 incident as a hate crime, despite knowledge of Cheney's racist and biased social media posts, including support for the "Proud Boys," a known White supremacist group, *id*. ¶¶ 102-105, (6) Ronnie's donned a "Thin Blue Line" mask in his meeting with Ms. James, "understood to be a symbol of White supremacy," *id*. ¶ 100; (7) Ronnie's reference to Ms. James and her brother London Lang at the Trump Rally as "the usual suspects," *id*. ¶ 114, *Ave. 6E Invs*., 818 F.3d at 505; (8) Perez and other SPPD officers denigrating comments about Ms. James at the Trump Rally, joking about "arresting" her for a "misdemeanor" for smoking in public, *id*.

true, that the [government action] bears more heavily on one race than another."); SAC ¶ 65. Regarding the July 8 incident, Plaintiffs allege SPPD officers Roppo and Carrillo only named Ms. Patterson as a victim of Richcreek's assault. *Id.* ¶ 45. Despite the fact that they are not Defendants, their conduct is part and parcel of the City's *Monell* liability for its policy, practice and custom of free speech repression, discrimination and retaliation of Ms. James, BLM protesters and African Americans. *Id.* ¶ 17. Further, Plaintiffs allege that when they contacted SPPD seeking victims' assistance, SPPD only provided that assistance to Ms. Patterson. *Id.* ¶ 60-66. In response to the finding that the FAC contained "no allegations that SPPD ever followed up with Patterson as promised," the SAC alleges that she "received multiple phone calls and offers to assist from several high-ranking officers, including Sergeant Abdalla, Sergeant Louie and Detective Palmieri." *Id.* ¶ 61. In an email referencing his call with Ms. Patterson, Sergeant Abdalla stated "I look forward to working with you in the future towards a successful prosecution in your case." Ms. James never received such a phone call from Detective Abdalla, or anyone else at SPPD. *Id.* ¶ 63.

Regarding Ms. James' claim that Defendants Bartl and Perez selectively enforced a City ordinance against her on September 22, and not against White Trump supporters at the November 1 Trump Rally, the SAC alleges they did so on account of both her race and her viewpoint. SAC ¶¶ 90, 153; *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774 (1996) ("the [Equal Protection Clause] prohibits selective enforcement of the law based on considerations such as race); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 922 (9th Cir. 2012). Regarding the September 22 incident, as discussed in section II.A, *supra*, Bartl and Perez threatened to seize Ms. James' signs for purportedly violating the City's signage ordinance, in defiance of the "hands off" policy, whereas they refused to hold White Trump supporters accountable for their violation of the City's merchandise ordinance, a decision the City Manager admitted was wrong. SAC ¶ 90.

Importantly, with former President Trump openly supporting groups like the Proud Boys and Oathkeepers who espouse anti-BLM and pro White nationalist viewpoints, Trump supporters are widely understood to share them. *See* fn. 1, *supra*. Indeed, the City learned through its Wyatt investigation that there are members of Oathkeepers within SPPD's ranks. *Id.* ¶ 131.Taking these facts together with the statistical evidence of SPPD's disproportionate targeting of African Americans, *id.* ¶ 144, Plaintiffs sufficiently allege Equal Protection claims against all Defendants.

Finally, Plaintiffs also sufficiently pled an equal protection claim based on viewpoint discrimination, wherein they as BLM supporters were treated less favorably than White Trump protesters. FAC ¶¶ 86-92. "Under the Equal Protection Clause, the 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *White*, 2022 WL 2052596, at *6 (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)). As discussed, the SAC pleads ample facts showing SPPD's bias toward BLM supporters and favoritism of Trump protesters. SAC ¶¶ 90, 91, 107-117; section II.C. *supra*.

**C. Defendants Violated the Bane Act**

The SAC sufficiently pleads Defendants' Bane Act violations, based on their conduct on September 22, 2020, when they threatened to seize her protest signs in violation of Ms. James' First Amendment rights. SAC ¶¶ 171-179. In its November 3 Order, the Court held that Plaintiffs failed to state Bane Act claims because her allegations that "Perez and Bartl threatened to seize her signs regarding the September 22 incident … were insufficient to support a First Amendment violation." As discussed in section III. B.1., *supra*, the SAC now plausibly alleges a First Amendment violation related to the September 22 incident.

Regarding the issue of whether Defendants attempt to seize Ms. James signs constitutes a Bane Act violation, numerous courts have upheld Bane Act allegations like the one Ms. James faced. *See Cuviello v. City of Vallejo*, No. 16-cv-02584-

KJM-KJN, 2020 WL 6728796, at *9 (E.D. Cal. Nov. 16, 2020) (threat to seize bullhorn); *Cuviello v. City & Cnty. of San Francisco*, 940 F. Supp. 2d 1071, 1103 (N.D. Cal. 2013) (defendants "threatened [plaintiffs with arrest if they were to protest outside of the 'free speech area,'"); *Martinez v. Cnty. of Sonoma*, No. 15-CV-01953-JST, 2015 WL 5354071, at *9 (N.D. Cal. Sept. 14, 2015) (defendant "coerced plaintiffs through threats and punishment"); *Holland v. City of San Francisco*, No. C10-2603 TEH, 2013 WL 968295, at *10 (N.D. Cal. Mar. 12, 2013) (alleging retaliation for protected speech and unlawful strip search).

This is not a case in which Defendants relied on speech alone to violate Plaintiffs' constitutional rights. *C.f.* Cal. Civ. Code § 52.1(k). Indeed, Bartl and Perez's threat to seize Plaintiffs' signs is akin to violation of their right to be free from unreasonable search, seizure and arrest by law enforcement which courts deem inherently coercive under the Bane Act. *See Black Lives Matter-Stockton Chapter*, F. Supp. 3d 660 at 680; *See also Gifford v. Hornbrook Fire Prot. Dist.*, No. 2:16-CV-0596-JAM-DMC, 2021 WL 4168532, at *29 (E.D. Cal. Sept. 14, 2021) (collecting cases); *Johnson v. Shasta Cnty.*, 83 F. Supp. 3d 918, 935 (E.D. Cal. 2015) (upholding Bane Act claim under constitutional right "to be secure in their persons, houses, papers, and effects).[8]

Furthermore, Plaintiffs also sufficiently state a Bane Act claim based on Defendants' deliberate indifference to the threat of violence posed by third parties in violation of Plaintiffs' 14th Amendment due process rights. Where, as here, Defendants' conduct involved intentional coercive conduct extending beyond an ordinary tort action, courts have upheld Bane Act claims. *See* SAC 172 (a)-(b); *Atayde v. Napa State Hosp.*, No. 116CV00398DADSAB, 2016 WL 4943959, at *8

---

[8] The cases Defendants rely are inapposite because they do not involve conduct by law enforcement. *See Richter v. Ausmus*, No. 19-CV-08300-WHO, 2021 WL 580055, at *10 (N.D. Cal. Feb. 16, 2021) (alleging non-violent threats by private party); *Smith v. Cnty. of Santa Cruz*, 2020 WL 6318705, at *10 (N.D. Cal. Oct. 28, 2020) (order by administrative hearing officer regarding a civil penalty).

(E.D. Cal. Sept. 16, 2016) (upholding Bane Act claim based on deliberate indifference to medical needs); *Johnson*, 83 F. Supp. 3d at 935 (distinguishing *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 137 Cal.Rptr.3d 839 (2012) to situations where the conduct is unintentional).

Here, as in *Atayade*, Plaintiffs predicate their Bane Act claim on Defendants' "deliberate indifference" to their constitutional rights and Defendants' "affirmatively culpable conduct." *Atayade*, 2016 WL 4943959, at *8. Here, the Court found that Defendants "made Plaintiffs vulnerable to harm they would not otherwise have faced, "including the foreseeable . . . attack by Defendant Cheney," particularly "against the backdrop of a "well-documented rise of violent attacks on BLM and racial justice protestors by White supremacists, and supporters of other extremist groups that explicitly oppose BLM, like Defendant Cheney." Order at 24. The Court further held that "Plaintiffs have plausibly alleged that Ronnie, Perez, and Bartl acted with deliberate indifference toward the obvious danger that a White supremacist who opposed the BLM movement, such as Plaintiffs allege Cheney to be, posed to James." *Id*. at 26. These allegations also state a Bane Act claim.

**D. Defendants Breached Mandatory Duties Related to Hate Crimes**

The SAC sufficiently pleads claims that Defendants failed to carry out their mandatory duties to follow certain procedures in investigating hate crimes and provide victims' assistance in violation of Government Code § 815.6.[9] Defendants' mandatory duties derive from obligations imposed under the California Penal Code, as incorporated into the POST Model Hate Crimes Policy, which SPPD in turn was required to, and did incorporate into its own Hate Crimes Policy. SAC ¶ 34; Penal Code §§ 13519.6(c), 422.87, 422.92; Plaintiffs' RJN at ¶¶ 1, 4. The specific

[9] Liability under Government Code § 815.6 is predicated on three elements: (1) the "enactment which imposes a mandatory, not discretionary, duty," (2) the enactment must be intended to protect against the kind of risk of injury suffered by the individual asserting liability," and (3) "the breach of duty must be a proximate cause of the injury suffered." *Doggett v. United States*, 875 F.2d 684, 691 (9th Cir. 1988).

mandatory duties Defendants failed to follow include providing: (1) a "Hate Crimes Checklist" to all officers to follow when responding to a potential hate crime, SAC ¶¶ 33, 34, and (2) a Hate Crimes Brochure to victims, SAC ¶ 32. Because the SAC alleged Defendants repeatedly failed to fulfill either of these obligations, Plaintiffs have adequately pled mandatory duty claims.

In its November 3 Order, the Court only takes issue with § 815.6's second element, stating "Penal Code § 13519.6(c) … still leaves discretion to state law enforcement agencies on how to implement its procedures." Order at 40. However, regardless of whether the relevant enactments, including but not limited to Penal Code § 13519.6(c), include certain discretionary obligations, it is indisputable they also include pertinent mandatory obligations. SAC ¶ 34. Courts have held that where both discretionary and mandatory provisions are part of the enactment, the mandatory provisions "pertinent to plaintiff's cause of action … creates a mandatory duty." *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 502, 993 P.2d 983 (2000).

Here, the pertinent mandatory provisions are (1) Penal Code § 422.87(a)(6), requiring SPPD to provide officers a "checklist of first responder responsibilities," *see also* 2019 POST Model Policy ("Agencies ***shall*** provide a checklist to first responders to provide direction for the investigation of all hate crimes as mandated by CPC 422.87") and (2) Penal Code § 422.92(a), requiring law enforcement officers to provide victims a "hate crimes brochure," see also Penal Code § 422.87(a)(6) (identifying among first responders' mandatory duties "giving the victims and any interested persons the agency's hate crimes brochure, ***as required*** by Section 422.92"). SAC ¶¶ 31-33. Despite these specific and straightforward obligations SPPD was "***required to follow***," Defendants failed to do so here, which resulted in Plaintiffs being subject to repeated assaults. SAC ¶ SAC ¶¶ 32, 34, 36.

Indeed, a Hate Crimes brochure that is now posted on SPPD's website, and which appears to have been in existence since "5/2018," lists five different agencies who provide specialized assistance for victims of hate crimes like Plaintiffs. RJN at

¶ 4. Had SPPD complied with its straightforward obligation to provide Plaintiffs with this brochure on July 8 in response to the first Richcreek assault, there is little doubt they would have been better protected going forward. Instead, SPPD dismissed Plaintiffs pleas for help, falsely claim spitting was not an actionable offense, and that SPPD lacked resources to do anything more, including directing them on how to obtain a restraining order against their attacker. SAC ¶¶ 61-63.

Unlike the guidelines at issue in *Gonzalez v. United States*, 814 F.3d 1022, 1028 (9th Cir. 2016) which require FBI agents to make a series of judgment calls regarding whether to disclose information to local law enforcement, SPPD's obligations to make the "checklist of first responder responsibilities" available to its officers, and provide a hate crimes brochure to victims, does not implicate any discretion. They are rote obligations, albeit important ones the legislature has deemed necessary in light of findings in a 2018 California State Auditor's Report that state law enforcement "has not taken adequate action to identify, report, and respond to hate crimes." Plaintiffs' RJN at Ex. B, Foreword. Indeed, while law enforcement officers may "generally" be entitled to discretion in how they investigate crimes, neither Government Code § 815.6 nor any of its companion immunity statutes identifies any blanket law enforcement exemption. This is particularly so where, as here, the legislature has opted to impose greater oversight and accountability over law enforcement in the area of hate crimes, which "[i]f not addressed professionally and thoroughly they may undermine public confidence in law enforcement." *See* RJN at *Id*. (citing 2018 California State Auditor's Report which found that "agencies did not properly identify some hate crimes, and underreported or misreported hate crimes as well.")

For all of these reasons, the Court should not dismiss Plaintiffs' mandatory duty claim at the pleading stage, and allow the parties to develop the factual record, where Defendants will have the opportunity to "establish[] that [they] exercised reasonable diligence to discharge [their] dut[ies]." Gov. Code § 815.6.

**E. Plaintiffs' Sufficiently Pled a Basis for Injunctive Relief**

The SAC adds allegations to support Plaintiffs entitlement to injunctive relief, showing that because of the City's complete lack of accountability for its unabated policy, practice and custom of free speech repression, discrimination and retaliation against them, their civil rights continue to be at risk. *See* SAC ¶¶ 139-146; *Atayde*, 2016 WL 4943959 at *6 (*citing and quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 111(1983)) ("injunctive relief is an appropriate remedy for halting a pattern or practice of injurious behavior" and require a 'real and immediate' threat of future injury). While "[p]ast wrongs do not by themselves amount to real and immediate threats of injury," where as here they are accompanied by "continuing, present adverse effect," they support a claim for injunctive relief. *Id*. (denying injunctive relief because "decedent ha[d] [] passed away … [and there were no] factual allegations showing that [defendants] had previously subjected [plaintiff] to unlawful conduct") (citations and quotations omitted).

In response the Court's finding that Plaintiffs "fail to allege that [Defendants' alleged unlawful] policy continues to exist, such that it presents a likelihood of harm," Order at 41, the SAC now adds several allegations to overcome this determination. First, the SAC specifically alleges that "the City [has not] enjoined any of the relevant policies, practices and customs that led to the civil rights violations SPPD committed against Plaintiffs … Thus, the City has left the door wide open for similar violations against Plaintiffs and other peaceful protestors whose viewpoints and messaging SPPD and other City officials disagree." SAC ¶ 141. Moreover, "[o] n information and belief, not a single SPPD officer or City official was disciplined in any manner in connection with the findings of the Wyatt investigation, or any of the incidents referenced in this lawsuit." *Id*.

In dismissing their injunctive relief claim, the Court also reasoned that "in the two years since the events giving rise to Plaintiffs' FAC," "[a]lthough Plaintiffs allege that the July and October incidents chilled their free speech …there are no

allegations of any First or Fourteenth Amendment violations occurring." Order at 41. In fact, this is so because Plaintiffs ceased protest activity for fear of future harm, and instead advocated directly with the City Council to force SPPD to change its practices, "particularly given their need for assurances that they could ***resume peaceful BLM protests and other protected activity***," which the City Council never provided. SAC ¶¶ 141-146 (summarizing further advocacy efforts "to date").

**F. Plaintiffs are Entitled to Leave to Amend, If Need Be**

In the event the Court determines that the SAC fails to sufficiently plead facts to support any of their claims, leave to amend should be granted. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1010 (9th Cir. 2008) ("leave shall be freely given where 'justice so requires.'") (quoting Fed. R. Civ. P. 15); *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (leave should be granted "unless ... the pleading could not possibly be cured by the allegation of other facts"). Here, ongoing discovery is likely to yield further facts in support of Plaintiffs' claims. Hoq Decl. ¶¶ 4-6. Importantly, Defendants discovery responses are admittedly incomplete, and they have failed to produce highly relevant portions of the Wyatt investigation reports and supporting documents, which could cure perceived pleading deficiencies including as to the issue of animus. *Id.* ¶¶ 4-5; *Mendoza v. Princess House, Inc.*, No. 521CV01491FWSSHK, 2022 WL 3574449, at *1 (C.D. Cal. July 8, 2022) (granting leave to "to incorporate new information from discovery"); *c.f. Metzler Inv. GmbH v. Corinthian Colls. Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008) (denying leave only where plaintiff "points to no additional facts that it might allege to cure deficiencies").

## IV. CONCLUSION

For these reasons, the Court should deny the City Defendants' Motion.

DATED: January 17, 2023

HOQ LAW

SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP

V. James DeSimone Law

*/s/Laboni A. Hoq*

By: ________________________________

Laboni A. Hoq

*Attorneys for Plaintiffs Fahren James and Victoria Patterson*